A06A2135, A06A2136. PAUL et al. v. SMITH, GAMBRELL & RUSSELL et al.; and vice versa.

(642 SE2d 217)

MIKELL, Judge.

This is a continuation of legal malpractice litigation brought by appellants/cross-appellees Douglas Paul, Sharon Paul, Catspaw, Inc. ("Catspaw"), Catspaw Productions, Inc. ("CPI"), Atlanta Catco, Inc. ("Catco"), and Recording Studio, Inc. ("RSI") (collectively, the "appellants"), against Smith, Gambrell & Russell n/k/a Smith, Gambrell & Russell, LLP (the "law firm"). The law firm represented appellants before and during commercial litigation brought by their former business partner, Ralph Destito, which culminated in a 1999 verdict and judgment against them for $489,727 in actual damages, $90,000 in litigation costs and expenses, and $450,000 in punitive damages. The judgment was affirmed on appeal.[1]

On July 3, 2002, appellants filed this legal malpractice action against the law firm, seeking to recover the sums they paid to Destito to satisfy the judgment. Initially, the law firm moved for partial summary judgment on two issues: whether it could be held liable for the punitive damage award and whether it was entitled to judgmental immunity[2] for failing to call appellants' expert on accounting as a witness. The trial court granted summary judgment to the law firm on both issues, and appellants appealed. In *Paul v. Smith, Gambrell & Russell* ("*Paul II*"),[3] we affirmed on the issue of punitive damages but reversed on the issue of judgmental immunity, holding that whether the law firm's failure to call the expert witness was an "exercise of honest professional judgment" was a jury issue "under the facts and circumstances of this case in light of evidence of conflicts of interest."[4]

After we decided *Paul II*, the law firm moved for summary judgment on appellants' claims that the law firm negligently failed to

---

[1] *Paul v. Destito*, 250 Ga. App. 631 (550 SE2d 739) (2001) ("*Paul I*").

[2] See *Hudson v. Windholz*, 202 Ga. App. 882, 886 (3) (416 SE2d 120) (1992) (judgmental immunity protects an attorney from liability "for acts and omissions [committed] in the conduct of litigation which are based on an honest exercise of professional judgment") (citation and punctuation omitted).

[3] 267 Ga. App. 107 (599 SE2d 206) (2004).

[4] Id. at 108.

prepare appellants properly for trial and committed malpractice in the preparation of corporate documents merging CPI into RSI and in undoing the merger after Destito objected. The trial court granted the law firm's motion on the claim of inadequate trial preparation but denied it on the claim related to the corporate documents. In Case No. A06A2135, appellants appeal the grant of summary judgment to the law firm on the trial preparation claim. In Case No. A06A2136, the law firm cross-appeals the denial of summary judgment on the issue of its liability for negligent preparation of the merger documents. We affirm the judgments in both cases.

At the outset, we address the guidelines and facts relevant to both cases. On appeal from the grant or denial of a motion for summary judgment, this Court conducts a de novo review of the law and the evidence.[5] Further, we follow the standards announced in *Lau's Corp. v. Haskins.*[6]

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial.[7]

Viewing the evidence most favorably to appellants, as the non-movants, and recounting certain facts from *Paul I*, the record shows that the law firm began representing appellants in 1985 and acted as counsel for the various corporate entities. Catspaw, Mr. Paul's wholly-owned company, was used to market his "voice-over" services for television and radio. The Pauls and another investor, Sarah Cotton, formed CPI in 1986, with the law firm's assistance, to produce and sell commercials. Destito was hired as CPI's sales manager in 1986. Shortly thereafter, the Pauls, Cotton, and Destito formed RSI, again

---

[5] *Alta Anesthesia Assoc. of Ga. v. Bouhan, Williams & Levy, LLP*, 268 Ga. App. 139, 143 (1) (601 SE2d 503) (2004).

[6] 261 Ga. 491 (405 SE2d 474) (1991).

[7] (Citation omitted; emphasis in original.) Id.

with the law firm's assistance. Although the parties originally intended RSI to be a recording studio, it simply leased recording equipment to CPI. Cotton and Destito owned 49 percent of RSI, while the Pauls held 51 percent of the stock.[8] Also in 1986, the law firm formed Destito Management and Marketing, Inc., and the Pauls and Destito were all shareholders.

In 1987, the Pauls loaned RSI $130,000 for the purchase of recording equipment to lease to CPI, and CPI paid RSI $25 per hour for use of the equipment.[9] In 1989, the Pauls formed Catco, which they wholly owned, to purchase and hold title to real estate that became a production studio for CPI.[10] Again, the law firm represented and advised the Pauls in the incorporation and operation of Catco. Catco obtained a loan to purchase the property and pledged RSI's assets as collateral, a fact Destito did not discover until after he filed suit.[11]

In 1991, CPI and RSI experienced cash flow problems. Cotton left the business, surrendering her RSI stock, which was redistributed to the Pauls and Destito, so that each became equal shareholders in RSI. Destito testified at the underlying trial that the companies "made it through" the financial crisis and CPI began making money. Nevertheless, CPI did not pay monies it owed to RSI, and the company continued to show business losses.[12] At the end of 1994, the Pauls changed Destito's compensation package from a salary to straight commission, promising to assign him new accounts. According to Destito, his new position did not work out as planned, and his pay decreased.[13]

RSI ultimately was merged into CPI. Documents effectuating the merger, which were not presented to Destito, were filed with the Secretary of State on December 28, 1995. When Destito learned of this action in early 1996, he objected, and the law firm filed a certificate of correction with the Secretary of State purporting to "undo" the merger. The relationship between Destito and the Pauls continued to deteriorate, and CPI fired Destito on February 16, 1996.[14]

Destito filed suit in May 1996, asserting claims of fraud, misrepresentation, breach of fiduciary duty, alter ego liability, attorney fees, and punitive damages. The case ultimately proceeded to trial in 1999.

---

[8] *Paul I*, supra at 632.
[9] Id.
[10] Id.
[11] Id.
[12] Id. at 633.
[13] Id.
[14] Id. at 634.

Destito claimed that appellants siphoned money from RSI, concealed improper financial dealings from him, and used recording equipment without paying RSI rental fees.[15] Evidently the jury agreed, awarding Destito an aggregate total of $1,029,727.

### Case No. A06A2135

1. Appellants assign error to the trial court's grant of summary judgment on their malpractice claim based on allegedly inadequate trial preparation. To prevail on this claim, appellants must show "(1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damages to the plaintiff."[16] Here, the trial court held that appellants had failed to put forth evidence to create a jury issue on causation, i.e., that but for the law firm's failure to prepare them properly for trial, the outcome of the underlying case would have been different. We agree.

"A claim for legal malpractice is sui generis insofar as the plaintiff's proof of damages effectively requires proof that he would have prevailed in the original litigation but for the act of the attorney charged with malpractice."[17] Appellants cite numerous alleged errors or inadequacies in preparation; however, appellants fail to show that better preparation would have resulted in a defense verdict.

The Pauls first contend that the law firm did not explain to them that they could revise or correct their deposition testimony. This assertion is unsupported in the record, because Mr. Paul also admitted that the law firm sent him the deposition along with the correction sheet. The correction sheet has been included in the record, and it reflects numerous changes.

The Pauls also complain that the law firm failed to explain the consequences of being called to testify first, as adverse witnesses. But Mr. Paul deposed that "[w]hat order you get up on the stand . . . I don't think that affects whether you're telling the truth or not. I'm truthful." Mrs. Paul argues that she was placed on the stand unprepared to answer opposing counsel's questions regarding the corporation's financial statements. As a result she became frustrated and "was presented as an angry, upset woman." In addition, Mr. Paul deposed that if he had been taught to respond to questions correctly he would have been "more clear on certain things" and "answered a question in

---

[15] Id.

[16] (Citations and punctuation omitted.) *Paul II*, supra at 108 (1).

[17] (Citation and punctuation omitted.) *White v. Rolley*, 225 Ga. App. 467, 468 (1) (484 SE2d 83) (1997), additionally citing *Nix v. Crews*, 200 Ga. App. 58, 59 (2) (406 SE2d 566) (1991).

more detail." He testified, for example, that he was made to "look like a fool" on the stand concerning a revolving intercompany loan for $73,000 because he was unprepared to testify about it. But Mr. Paul also testified that he was "not a numbers guy" and truthfully testified that he had no direct knowledge regarding the "facts and figures." Appellants' expert, William A. Gregory, averred if the law firm had prepared the Pauls adequately for trial, they could have given more meaningful answers, and the failure to prepare them made them appear "evasive" to the jury.

We find this generalized expert testimony insufficient to raise an issue of fact on whether appellants would have prevailed in the underlying litigation if they had been prepared differently for trial. The record is replete with evidence of pretrial preparation. Specifically, Mrs. Paul admitted that she had "a dozen" meetings with their trial counsel, Rex Lamb, a member of the law firm, after Destito filed his complaint; that the Pauls and their bookkeeper had a lengthy pretrial preparation meeting with Lamb on September 23, 1999, for which he billed nine and a half hours; that they reviewed the facts of the case with Lamb; and that the next day the Pauls had a telephone conversation concerning the upcoming trial. Mrs. Paul further admitted that she had lived with the case for years; had read her depositions a few days prior to trial; and that the facts of the case, as well as her deposition testimony, were fresh in her mind when she walked into court. There is no evidence that the Pauls failed to give testimony that they would have given if they had been better prepared, or that such evidence would have changed the outcome of the trial in *Paul I*. Thus, we find insufficient evidence in the record to create a genuine issue as to the essential element of causation.

Appellants contend that, because in *Paul II* we reversed the grant of summary judgment to the law firm on the judgmental immunity defense due to the presence of conflicts of interest, we must reverse the grant of summary judgment on the trial preparation issue as well.[18] We disagree. We conclude, as did the trial court, that given the Pauls' inability to articulate specific relevant matters to which they did not testify because of some alleged failure by counsel to prepare them adequately for trial, no conflict of interest could have impacted the outcome of the underlying litigation. Accordingly, the Pauls cannot survive summary judgment because they have failed to raise a genuine issue of material fact as to causation.

2. We do not address appellants' contention that the grant of summary judgment was error on their separate claim that the law firm failed to advise the Pauls that their longtime corporate attorney,

---

[18] *Paul II*, supra at 111 (1).

William L. Meyer, who was also a member of the law firm, could be called as a material witness in the underlying case, or that his testimony, or the law firm's continued representation of appellants, could have a negative impact on the jury. Although the law firm's motion recites that it is "entitled to summary judgment on the entire case," neither the motion nor the brief filed in support thereof addresses this claim, and the trial court did not rule on it. The court considered the law firm's motion as one for *partial* summary judgment. Thus, although appellants raise the issue on appeal, we will not address it, and it remains pending below.[19]

### Case No. A06A2136

3. In its cross-appeal, the law firm argues that the trial court erred in denying summary judgment on appellants' malpractice claim related to the preparation of corporate documents. We disagree.

As to this claim, appellants came forward with sufficient evidence to survive summary judgment on all three elements: employment of the law firm, its failure to exercise ordinary care, skill and diligence, and a causal connection between such failure and appellants' damages.[20] Viewed most favorably to appellants, the evidence shows that Mrs. Paul thought about taking steps to make RSI "go away" every year between 1991 and 1995 when she filed the company's tax returns because it was costing her money to keep it running. Mrs. Paul deposed that she consulted with her corporate tax accountant, who suggested merging RSI into CPI. Mrs. Paul asked Meyer to make RSI "go away," and she and her husband signed documents prepared by the law firm to effectuate that result. When asked whether she had discussed the merger with Destito, she replied: "Not about a discussion of a merger, but about making the company go away. I don't know what a merger is. I don't know what a dissolution is. I only know I needed it to go away."

The law firm prepared the merger documents, including one entitled "Unanimous Written Consent of the Board of Directors and the Shareholders of [RSI] Taken as of December 27, 1995 In Lieu of a Special Meeting." This document was signed by the Pauls as directors and as shareholders; it did not contain a signature line for Destito. According to Meyer, the signature line was deliberately omitted because Mrs. Paul had informed the law firm that Destito "essentially had abandoned his stock, that he realized it had no

---

[19] See id. at 112 (2) (a) (issue of whether appellants herein could recover punitive damages in this legal malpractice action was not raised or ruled on by the trial court and was not properly before this Court on appeal).

[20] See Division 1, supra at n. 16.

value, . . . that he was consulted about the merger, [and] he was okay with it." However, Meyer also deposed that he and other members of the law firm researched, counseled and advised appellants regarding the "merger and unmerger of RSI into CPI in light of Mr. Destito's demands." Meyer knew that on December 1, 1995, Destito was a shareholder in RSI. The law firm kept RSI's corporate documents and prepared all the merger documents, which Meyer reviewed. Meyer was aware that Georgia law required a merger to be approved by the board of directors and shareholders of the disappearing corporation. Instead of following this process, however, he relied on Mrs. Paul's alleged statement that Destito had abandoned his stock.

When Mr. Paul was asked why he signed the unanimous consent document even though it did not contain a signature line for Destito, he deposed: "I signed it as a true document prepared by [the law firm]. I now know that [the law firm] screwed up."

It is undisputed that Destito objected when he learned that the merger had occurred without his consent. Thereafter, on April 10, 1996, the law firm filed a certificate of correction with the Secretary of State purporting to "undo" the merger. This certificate recited that the "Agreement and Plan of Merger was not duly approved by the stockholders of [RSI]," and that the merger was "void ab initio." This did not satisfy Destito, and he filed suit the following month.

In this malpractice litigation, appellants allege that the merger documents were not prepared with the requisite degree of skill and care required of an attorney under similar circumstances. Appellants' expert, Gregory, averred that the law firm had deviated from the standard of care by failing to advise appellants of the potential adverse consequences of filing a certificate of merger, which might be used as evidence of a fraudulent intent; that failing to advise appellants of their fiduciary duty to disclose the proposed merger to all of the shareholders resulted in appellants' liability for fraud; and that the filing of the certificate of correction deviated from the standard of care because it "was used by . . . Destito as alleged evidence of a scheme to harm him as the minority shareholder."

The law firm argued that it was entitled to summary judgment on this malpractice claim based on the oft-cited rule announced in *Berman v. Rubin*,[21] that "when the document's meaning is plain, obvious, and requires no legal explanation, and the client is well educated, laboring under no disability, and has had the opportunity to read what he signed, no action for professional malpractice based on counsel's alleged misrepresentation of the document will lie."[22]

---

[21] 138 Ga. App. 849 (227 SE2d 802) (1976).
[22] Id. at 855.

The consent document recites that the "undersigned" are "all of the shareholders" of RSI and that such shareholders "deem it advisable that the Corporation be merged into [Catspaw] and ... thereafter cease to exist." The certificate of merger recites that the "Agreement and Plan of Merger was duly approved by the stockholders of [RSI]." It is signed by Mr. Paul, as president of Catspaw. The law firm argues that the documents are plain, obvious, and require no legal explanation, and that the Pauls were well educated, labored under no disability, and admitted having the opportunity to read the documents they signed. Therefore, citing the *Berman* rule, the law firm contended that it should be relieved of liability for any injury arising from negligent preparation of the documents.[23]

Although the trial court agreed with the law firm's reasoning, the court denied summary judgment on this issue. The record reflected that the Pauls knew that they were not the only two shareholders of RSI when they signed the merger documents and that the documents were plain, obvious, and required no legal explanation. However, the trial court deemed itself "constrained" to find that *Berman* did not apply, because appellants were operating under some disability due to the disputed issues of the law firm's conflicts of interest found to exist by this Court in *Paul II*.[24]

We do not agree that the trial court was so constrained. However, a grant or denial of summary judgment will be affirmed if it is right for any reason.[25] Here, *Berman* would not mandate summary judgment for the law firm on this issue regardless of alleged conflicts of interest because questions of fact exist as to whether the Pauls understood the ramifications of executing merger documents without Destito's written consent.

The *Berman* rule emanates from the principle of contract law that a person who has the opportunity to read a contract before signing it is bound by its terms.[26] But *Berman* also cautions that it

> should not be read to state or imply that an attorney may not be held responsible for his negligent draftsmanship whenever the client can or does read the document. Indeed, where the document requires substantive or procedural knowledge, is ambiguous, or is of uncertain application, the attorney may well be liable for negligence, notwithstanding the

---

[23] See *De La Maria v. Powell, Goldstein, Frazer & Murphy*, 612 FSupp. 1507, 1517 (V) (C) (N.D. Ga. 1985), citing *Berman*, supra.

[24] See *Paul II*, supra at 111 (1).

[25] *Alta Anesthesia Assoc.*, supra at 142-143 (1).

[26] See *Berman*, supra at 854 ("There are few rules of law more fundamental than that which requires a party to read what he signs and to be bound thereby").

fact that his client read what was drafted.[27]

In the case at bar, the true issue is neither the complexity nor the simplicity of the merger documents but the potential effect of the execution of those documents upon Destito and the jury in the underlying litigation. "Unlike *Berman*, the alleged negligence attributed to [the law firm] in the instant case does *not* relate so much to a factual issue as it does to the *legal effect* of the [merger documents] that appellant[s] signed."[28] There is evidence that the Pauls relied upon the law firm to effectuate the merger in compliance with Georgia law and that the law firm failed to do so. The effects of such a deviation from the standard of care upon a nonconsenting shareholder cannot be said to be within the Pauls' substantive or procedural knowledge as a matter of law. In this regard, we note that Mr. Paul deposed that he remembered asking Meyer how it was "going to play out," and Meyer responded that it did not matter what Destito wanted to do because the Pauls were majority shareholders. This testimony raises a jury question as to whether the law firm's actions caused the Pauls' damages.

*Berman* "was perhaps among those rare cases in which the questions of negligence and proximate cause could be removed from the jury."[29] Unlike in *Berman*, the Pauls' ability to read and comprehend the documents was not, as a matter of law, an intervening factor that broke the chain of causation.[30] A jury must decide the issues of negligence and causation raised by the preparation and execution of the merger documents and the certificate of correction.

*Judgments affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED FEBRUARY 15, 2007.

*Frank J. Beltran, Douglas V. Chandler*, for appellants.

---

[27] Id. at 854-855.

[28] (Emphasis in original.) *Little v. Middleton*, 198 Ga. App. 393, 395 (1) (401 SE2d 751) (1991) (question of fact existed as to whether client had subjective understanding of the preclusive effect of the release executed). Compare *Hudson*, supra at 886-887 (3) (judgmental immunity barred client's malpractice claim against attorney for recommending that client execute simple release). See also *Graivier v. Dreger & McClelland*, 280 Ga. App. 74, 77 (1) (a) (i), 79 (1) (a) (ii) (633 SE2d 406) (2006) (questions of fact remained as to whether attorney's preparation of LLC's technical and lengthy operating agreement was negligent and proximately caused damages).

[29] (Citation omitted.) *Kushner v. McLarty*, 165 Ga. App. 400, 402 (1) (300 SE2d 531) (1983).

[30] *Berman*, supra at 855 (on motion for rehearing).

*Weinberg, Wheeler, Hudgins, Gunn & Dial, Robert G. Tanner, Shawn D. Scott,* for appellees.