**THIRD DIVISION**
**GOBEIL,**
**COOMER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 5, 2019**

# In the Court of Appeals of Georgia

A18A1840. MCNEILL et al. v. SD&D GREENBUILT, LLC.

COOMER, Judge.

In this legal malpractice action, Appellants Brett D. McNeill and his law firm, Coleman Talley, LLP, (collectively referred to herein as "Talley") challenge the trial court's order denying their motion for summary judgment. Talley sought judgment as a matter of law that it was not liable for the loss of SD&D Greenbuilt, LLC's ("Greenbuilt") $150,000 earnest money deposit that was forfeited in a real estate transaction. After the trial court denied Talley's motion, it granted Talley's application for a certificate of review, and we granted its application for interlocutory appeal. This appeal followed, and we affirm the judgment of the trial court.

The disposition of this appeal rests solely on the question of whether *Berman v. Rubin*, 138 Ga. App. 849 (227 SE2d 802) (1976) bars Greenbuilt's legal malpractice claim. In *Berman*, we held that

> when [a] document's meaning is plain, obvious, and requires no legal explanation, and the client is well educated, laboring under no disability, and has had the opportunity to read what he signed, no action for professional malpractice based on counsel's alleged misrepresentation of the document will lie.

*Id.* at 855. Talley argues that *Berman* bars Greenbuilt's claim, and Greenbuilt counters that *Berman* is inapplicable because the alleged negligence does not involve its understanding of the contract but rather involves its reliance on Talley's incorrect affirmative misrepresentations as to the legal effect of negotiated extensions between the parties. The relevant facts are set forth below.

Greenbuilt is a real estate development company that is owned by Bradley Francis and his father, Denis Francis. Denis Francis deposed that he began his real estate career in 1975, when he purchased apartment buildings and negotiated his tenants' leases. By the 1980s, Denis Francis engaged in buying, selling, and renovating properties and personally negotiated his own purchase and sale agreements. In 2005, he formed a company to build and sell homes, which Bradley

2

helped him run. Bradley deposed that in his prior employment before Greenbuilt, he reviewed and signed contracts on behalf his employer. Talley's position is that the Francises were both experienced real estate investors. Greenbuilt counters that the Francises had limited experience in commercial real estate, which was far more complex than their residential real estate deals.

In early 2016, Greenbuilt retained McNeill and his firm to advise and assist with the purchase of several parcels of commercial real estate. On February 15, 2016, McNeill drafted a letter of intent for the transaction. McNeill deposed that there were two purchase and sale agreements, and that $150,000 of earnest money was deposited into his firm's trust account.[1] The Purchase and Sale Agreement, executed at the end of March 2016, listed a purchase price for four parcels of $4,200,000 and contained provisions that outlined when and under what circumstances Greenbuilt could cancel the contract and obtain a refund of its earnest money, specifically, Paragraphs 8 (A) and (C). Paragraph 8 (A) pertained to the right to inspect and terminate and provided as follows:

> *Right to Inspect and Right to Terminate.* . . . Buyer shall have until May 11, 2016 (the "*Due Diligence Date*"), to determine whether the Property

---

[1] The purchase and sale agreement included in the record reflect a different earnest money amount, but it is undisputed that the amount at issue is $150,000.

is suitable and satisfactory to Buyer based upon Buyer's Activities. In the event Buyer shall determine that the Property is not suitable and satisfactory to Buyer, Buyer shall have the right to terminate this Agreement, for any reason and in the Buyer's sole discretion, by giving written notice to Seller on or before 5:00 p.m. of the Due Diligence Date. If Buyer does not terminate this Agreement in accordance with this *Paragraph 8A* on or before the Due Diligence Date, Buyer shall have no further right to terminate this Agreement pursuant to this *Paragraph 8A*. . . .

Paragraph 8 (C) provided, in pertinent part, as follows:

*Environmental Testing* . . . . Further, if Additional Testing is required or recommended, Buyer shall have until May 26, 2016 to obtain the results of the Additional Testing provided that Buyer notifies Seller of the need for the Additional Testing before 5:00 p.m. on May 11, 2016, in which event Buyer may extend the date of Closing pursuant to *paragraph 5*, above. If the results of the Additional Testing indicate that the Property is impacted with Hazardous Materials (as hereinafter defined) in concentrations that exceed site specific non-residential standards, then Buyer may terminate this Agreement by written notice to Seller on or before May 26, 2016 and receive a return of the Earnest Money.

Bradley testified that he and his father read the contract, signed it, and understood it.

In a letter from McNeill to Greenbuilt, dated April 1, 2016, McNeill explained that the due diligence date was May 11, 2016, and that the buyer could terminate for any reason by 5:00 p.m. on the due diligence date and the earnest money would be immediately refunded. That letter also included a table that outlined the contract dates

4

and other important dates. In pertinent part, the table provided May 11, 2016 as the due diligence date, May 26, 2016, as the due diligence date if additional testing was required, and a closing date of May 26, 2016. On April 15, 2016, Denis Francis emailed McNeill, stating "I saw that the closing date has been extended. Does this mean that the due diligence period has been moved back two weeks also?" McNeill responded:

> At this point, we are still awaiting approval from the Seller to perform the Phase Two environmental study. Once they consent to the study, the Closing Date will automatically be extended. . . . But yes, you can terminate for environmental issues up to May 26th, if they consent to the additional testing. All other due diligence will still need to be performed before May 11th. McNeill also explained that the earnest money would only be released to the seller if the buyer committed an uncontested breach of contract or at closing. On April 19, 2016, McNeill informed Greenbuilt that he had received verbal approval for phase two assessment, "but I am still waiting on . . . confirmation of extension of the closing date and right to terminate." McNeill received written approval on April 22, 2016.

As of May 7, 2016, the financing for the project was not secure. Bradley testified that he shared this fact with McNeill. Environmental testing was conducted, which revealed large amounts of chlorine in the ground, but Greenbuilt did not

attempt to terminate the contract for that reason. On May 9, 2016, McNeill emailed seller's counsel the following: "This email is to confirm the extension of the Due Diligence Period for environmental issues to May 26th, and the closing to June 10th. . . . Buyer has asked me to confirm these dates once more before the expiration of the original due diligence date (May 11)." On the same day, McNeill emailed Greenbuilt, noting May 26, 2016, as an important date upon which the extended due diligence terminated.

On May 25, 2016, Denis Francis emailed McNeill seeking clarification about the earnest money. Specifically, Denis Francis asked if he would be able to recoup the earnest money once the due diligence period had passed. McNeill responded as follows:

> In regards to the earnest money: To be as clear as possible, if you don't terminate the contract by tomorrow, that money goes "hard", meaning it is fully earned by the seller. If you fail to close by_____[space left blank] for any reason after tomorrow COB, whether it's a choice or an inability to raise the funds, it will be considered a breach of contract and the earnest money will be owed to the seller. The only chance that you'd get the EM back after that point would be if, after tomorrow, the *seller* failed to close for some reason. I obviously don't want to scare you, but I do want to stress the significance of moving beyond tomorrow. Our firm is holding the money, but under the contract, we'd be obligated to

disburse it to the seller if you all fail to close. That disbursement can be contested, and the funds can be remitted to the court where both sides can argue about who it belongs to, but I wouldn't recommend that unless you can seriously point to a reason that the seller caused the breach. At this point, I can't think of any whatsoever. . . . If you and Brad are growing concerned about the ability to raise the money, or if there is any other reason you might choose to terminate, please fill me in.

On May 26, 2016, Bradley Francis emailed McNeill a proposed "Extension of Purchase Agreement Due Diligence Extension," indicating he was meeting with an unidentified party and asking if the document was sufficient. The document was unsigned and did not include the proposed extended date. McNeill responded that the document was sufficient.

Apparently the parties did not agree to the extension, and Bradley Francis sent a letter to the seller's attorneys on May 26, 2016, to terminate the purchase of the properties and seek a refund of the earnest money. After the close of business, the seller's attorneys informed McNeill via email that Greenbuilt apparently thought that the due diligence date with right to terminate for any reason was extended through 5:00 p.m. that day, which was incorrect, and that Greenbuilt sought the return of the earnest money, which the seller's attorney said would not be refunded.

Greenbuilt sued Talley for professional negligence, asserting that Talley provided negligent advice about the deadline for cancelling the contract. Greenbuilt referred to the April 1 letter from McNeill, which listed May 26, 2016, as the due diligence date if additional testing were required. Specifically, Greenbuilt asserted that Talley led it to believe that the due diligence termination date was May 26, 2016, when in fact, that date only applied if there was a need for additional environmental testing. Greenbuilt also alleged that Talley, as late as May 25, 2016, misrepresented in correspondence that the contract could still be terminated due to choice or an inability to raise funds.

Talley subsequently filed a motion for summary judgment, arguing that the "duty to read" defense, as originally set forth in *Berman*, 138 Ga. App. at 849, barred Greenbuilt's malpractice claim because Greenbuilt should have understood when and under what circumstances the contract could be terminated based on the plain language of the contract. Greenbuilt responded, arguing that Talley had admitted to giving patently erroneous legal advice. Specifically, Greenbuilt argued that Talley communicated that the right to terminate was extended without specifying that only the environmental testing period had been extended. The trial court summarily denied the motion for summary judgment, finding that genuine issues of material facts

precluded the grant of summary judgment. Talley was granted a certificate of immediate review, and this Court granted Talley's application for interlocutory review. This appeal followed.

In its sole enumeration of error, Talley argues that Greenbuilt cannot establish that Talley's alleged misrepresentation of the contract's termination deadline caused Greenbuilt to overlook the deadline. Talley maintains that Georgia law does not allow Greenbuilt to rely on its lawyer's representation of the deadline in lieu of Greenbuilt's own review of the termination provision. Talley relies heavily on *Berman*, which was a legal malpractice case arising out of a divorce proceeding. In that case, the appellant sued his attorney for negligent misrepresentation of his divorce settlement, which included a provision that explained that when the husband earned in excess of the stipulated amount of his income, "the amount of child support *per child* for that year *and* alimony for the wife for that year shall be increased by 15% of such increase." *Berman*, 138 Ga. App. 849-850 (emphasis in original). The trial court construed the agreement to require payment of 15% of the increased earnings to each child and to his wife, which amounted to 60% of his increased earnings, and the husband argued that his attorney represented that the additional payments would total only 15% of his earnings. *Id.* at 850. We noted therein that

9

[a]lthough it would otherwise be a jury question as to whether or not defendant [the attorney] had breached his duty towards [the husband], . . . [t]he record affirmatively shows that [the attorney's] actions were not the cause of the alleged injury to appellant [husband]. The agreement in this case is not ambiguous, nor is it technical or laced with "legal jargon." Appellant . . . admits that an initial draft of the agreement was unsatisfactory to him, that the draft was changed, that he read the changes, that he initialed each and every page, and that he placed his signature on the final page.

*Id.* at 854. Based on these facts, we held, as stated earlier, that

when the document's meaning is plain, obvious, and requires no legal explanation, and the client is well educated, laboring under no disability, and has had the opportunity to read what he signed, no action for professional malpractice based on counsel's alleged misrepresentation of the document will lie.

*Id.* at 855. Greenbuilt counters that *Berman* is inapplicable because the alleged negligence did not involve the deadlines set forth in the contract but McNeill's affirmative misrepresentations as to the legal effect of the extension of those dates which Talley negotiated after the contract was signed that Greenbuilt did not have a chance to review. We agree.

Since *Berman*, we have explained that the decision in that case "was perhaps among those rare cases in which the questions of negligence and proximate cause could be removed from the jury" because the meaning and legal effect of the disputed portions of the agreement in that case were obvious. *Kushner v. McLarty*, 165 Ga. App. 400, 402 (1) (300 SE2d 531) (1983). We noted in *Kushner* that even *Berman* recognized that its holding was a limited one, and our decision

> should not be read to state or imply that an attorney may not be held responsible for his negligent draftsmanship whenever the client can or does read the document. Indeed, where the document requires substantive or procedural knowledge, is ambiguous, or is of uncertain application, the attorney may well be liable for negligence, notwithstanding the fact that his client read what was drafted.

*Id.* This case, however, does not turn upon negligent draftmanship, like *Berman*, but rests instead on the effect of subsequent communications regarding potential alterations to the provisions of the contract.

In *Paul v. Smith, Gambrell & Russell*, 283 Ga. App. 584 (642 SE2d 217) (2007), we affirmed the denial of summary judgment where the issue was not the complexity or simplicity of the documents involved but the effect of executing the documents. *Id.* at 592 (3). We stated, "[u]nlike *Berman*, the alleged negligence

11

attributed to the law firm in the instant case does not relate so much to a factual issue as it does to the legal effect of the [merger documents] that appellant[s] signed." *Id.* *See generally*, *Whorter, Ltd. v. Irvin*, 154 Ga. App. 89, 91 (2) (267 SE2d 630) (1980) (plaintiff entitled to rely on the competence of attorney based on their attorney-client relationship and course of dealing rather than his own reading of the documents). Although *Paul*, supra, is not completely factually analogous, it lends some support to Greenbuilt's argument that the outcome here cannot simply be based on the reading of the contract where the alleged negligence relates to communications from McNeill regarding potential changes to the contract that occurred after they read it.

In the communication between McNeill and Greenbuilt on April 19, 2016, McNeill stated that he was waiting on confirmation of the extension of the closing date and the right to terminate, which could have led Greenbuilt to the conclusion that the termination date was still in play. On May 9, 2016, McNeill's correspondence aligned with the contract termination dates. Yet, on May 25, 2016, the communication between McNeill and Denis Francis could be construed such that the contract could be terminated for reasons other than the environmental testing as late as May 26, 2016. Therefore, reasonable minds could disagree as to whether the Francises were entitled to rely on their communications with McNeill after the signing of the

12

contract, as opposed to the language contained therein. Consequently, the question of whether Talley committed legal malpractice depends upon the answers to factual questions that must be resolved by a jury. Accordingly, the trial court did not err when it concluded that genuine issues of fact precluded the entry of summary judgment.

*Judgment affirmed. Gobeil and Hodges, JJ. concur.*