A91A1874. HUDSON et al. v. WINDHOLZ.
(416 SE2d 120)

POPE, Judge.

Plaintiffs/appellants appeal the order of the trial court granting summary judgment to defendant/appellee in a legal malpractice action.

Until early 1983, plaintiff Susan Hudson was married to Jennings Gordon. The couple continued to see each other romantically even after their divorce, until approximately August 9, 1984. In or about June of 1984, Ms. Hudson met and began a romantic relationship with plaintiff Gary Hudson, her present husband, so that during the summer of 1984, Ms. Hudson was romantically involved with both her ex-husband and Mr. Hudson. When Mr. Gordon discovered Ms. Hudson's relationship with Mr. Hudson, he apparently felt betrayed and began a course of harassment directed towards Ms. Hudson, subjecting her to a series of threatening, harassing and embarrassing acts, too numerous to recount in this opinion.

The course of conduct which gave rise to this litigation involves Mr. Gordon's distribution of copies of a number of extremely sexually explicit photographs that he had taken of Ms. Hudson prior to, during, and after their marriage, portraying Ms. Hudson in various stages of undress. In August of 1984, Mr. Gordon sent Ms. Hudson a sexually explicit photograph and threatened to send a copy to Ms. Hudson's employer and every real estate agency in Atlanta unless Ms. Hudson immediately left Atlanta. Mr. Gordon then sent a nude pho-

tograph of Ms. Hudson to two magazines, *Gallery* and *Genesis*, along with a fabricated proposed caption for the photograph and a forged model consent form that appeared to indicate that Ms. Hudson had consented to the publication of the photograph in the magazines. *Gallery* magazine ultimately published the nude photograph of Ms. Hudson in its October 1985 issue.

On August 29, 1985, two weeks before Mr. and Mrs. Hudson were to be married, Mr. Hudson found a copy of the October 1985 issue of *Gallery* in his mailbox with Ms. Hudson's business card attached to the magazine. On August 30, 1985, Ms. Hudson contacted and met with defendant Mr. Windholz. She was extremely upset and was contemplating cancelling her upcoming marriage to Mr. Hudson. During their conference, Ms. Hudson described the numerous harassing acts committed by Mr. Gordon during the past year and explained to Mr. Windholz that there were numerous, sexually explicit photographs of her still in Mr. Gordon's possession.

Later that day, a copy of *Gallery* magazine was delivered to the manager of the bank where Ms. Hudson was employed. On September 14, the Hudsons' wedding day, a plant was delivered to their new home with another sexually explicit photograph of Ms. Hudson placed inside the plant. On September 15, Ms. Hudson's mother returned to her home in Florida to find a copy of *Gallery* magazine and Ms. Hudson's business cards tacked to her door. On September 16, the Hudsons discovered that someone had broken into Ms. Hudson's car and glued yet another nude photograph of her to the dashboard. Following each of these incidents, Ms. Hudson contacted Mr. Windholz, telling him she was getting more and more anxious to put an end to Mr. Gordon's harassment. During subsequent meetings with the Hudsons, Mr. Windholz observed that Ms. Hudson was becoming emotionally distraught, and Mr. Hudson appeared so angry that defendant was concerned that he could become violent. Throughout their discussions with Mr. Windholz, the Hudsons indicated that Mr. Windholz's primary objective should be to stop Mr. Gordon's harassment.

Mr. Windholz initiated an investigation of the potential civil claims against both *Gallery* and its publisher, Montcalm Publishing Corporation (hereinafter collectively referred to as "*Gallery*") and Mr. Gordon. Mr. Windholz determined that the Hudsons' potential claims against *Gallery* for invasion of privacy were relatively tenuous. *Gallery* could assert as a defense that it had relied in good faith upon the model consent form that Mr. Gordon had forged, and moreover, had Mr. Gordon not personally distributed the *Gallery* issue to Ms. Hudson's relatives and employer, she might never have known that it existed, thereby never incurring any damages.

Mr. Windholz also feared that the introduction of the other far

more explicit photographs of Ms. Hudson in a suit against *Gallery* would injure Ms. Hudson's character more severely than had the publication of the relatively innocuous nude photograph in *Gallery*. Also, Mr. Windholz was concerned that an action against *Gallery* would be protracted and expensive, even on a contingency fee basis.

Mr. Windholz made a judgment that the most viable of the Hudsons' claims were those that might be asserted against Mr. Gordon. He therefore recommended that the Hudsons focus their attention on stopping Mr. Gordon's continuing harassment. This decision was communicated to the Hudsons orally and in a letter dated October 2, 1985, which detailed his efforts in accumulating evidence to assist the Hudsons in their claims against Mr. Gordon. The letter mentioned *Gallery* only insofar as it discusses the degree to which *Gallery* might be able to assist the Hudsons in the accumulation of evidence against Mr. Gordon. The October 2 letter also contained a written retainer agreement between Mr. Windholz and the Hudsons which discussed potential claims against Mr. Gordon and failed to mention *Gallery* in any respect. The retainer agreement was accepted by the Hudsons.

Thereafter, Mr. Windholz's efforts were directed toward accumulating evidence for use in a criminal prosecution or civil action against Mr. Gordon. Mr. Windholz determined that an important piece of evidence in any legal action against Mr. Gordon was the original model consent form forged and submitted to *Gallery* by Mr. Gordon. By obtaining the original form, Mr. Windholz could arrange for a handwriting and fingerprint analysis, which he believed necessary to link conclusively Mr. Gordon to the document. Moreover, by securing the original model consent form, Mr. Windholz could determine whether Mr. Gordon had affixed a notary seal on the designated portion of the document, thereby committing fraud in relation to such seal, another avenue for criminal prosecution. Mr. Windholz also determined that any attempt to obtain the original model consent form from *Gallery* by way of subpoena or other procedural device might be successful only after considerable delay. After having made this analysis and judgment, Mr. Windholz commenced negotiating with *Gallery* magazine attempting to obtain the original consent form. *Gallery*, however, indicated that it would not turn over the original document unless the Hudsons executed a release.

Mr. Windholz consulted with the Hudsons, by telephone and in person, and apprised them of his assessment of the relative strengths and weaknesses of their potential claims against both *Gallery* and Mr. Gordon. In this conversation, Mr. Windholz explained to the Hudsons the legal effect of executing the release that *Gallery* insisted upon in exchange for the immediate delivery of the original model consent form. Both over the telephone and during a half-hour long conference in his office, Mr. Windholz explained to the Hudsons that execution

of the release in favor of *Gallery* would forever preclude them from bringing any legal action against *Gallery* in connection with the publication of Ms. Hudson's nude photograph in the magazine.

The Hudsons claim Mr. Windholz, at this point, advised them that execution of the release in favor of *Gallery* was the only manner in which to gain access to the original model consent form. They also claim that the defendant affirmatively counseled them to execute the release. Even though Mr. Hudson argues that he was concerned that Mr. Windholz was rendering erroneous legal advice in this regard, he nevertheless took no action to allay his concerns, and both he and his wife executed the release in exchange for the original model consent form.

Thereafter, Mr. Windholz increased his efforts to put a stop to Mr. Gordon's harassment of the Hudsons, particularly by way of encouraging the proper authorities to press criminal charges against Mr. Gordon. Ultimately, successful criminal charges were asserted against Mr. Gordon and the campaign of harassment and humiliation against the Hudsons ceased.

In early 1986, before the authorities located Mr. Gordon, the Hudsons obtained a new attorney to represent them in connection with this matter. The Hudsons, represented by their new counsel, filed a civil action against Mr. Gordon and *Gallery* asserting claims against both defendants arising from the publication of Ms. Hudson's nude photograph in the magazine. *Gallery* subsequently moved for summary judgment, relying upon the release executed by the Hudsons. This court upheld the trial court's grant of summary judgment to *Gallery* in *Hudson v. Montcalm Publishing Corp.*, 190 Ga. App. 629 (379 SE2d 572) (1989). Ultimately, the Hudsons prevailed at trial against Mr. Gordon on their invasion of privacy claim and were awarded a verdict in the amount of $225,000. On October 30, 1989, approximately three-and-one-half years after the attorney-client relationship between the Hudsons and Mr. Windholz had ended, the Hudsons instituted this legal malpractice action.

1. We first reject defendant's argument that the grant of summary judgment to defendant must be affirmed by this court because plaintiffs failed to oppose the defendant's motion for summary judgment in the trial court. "There is no such thing as a 'default summary judgment.' By failing to respond to a motion for summary judgment, a party merely waives his right to present evidence in opposition to the motion. It does not automatically follow that the motion should be granted. 'A motion for summary judgment should not be granted unless it affirmatively appears from the pleadings and evidence that the party so moving is entitled to prevail.' [Cits.]" *McGivern v. First Capital Income Properties, Ltd.*, 188 Ga. App. 716, 717 (1) (373 SE2d 817) (1988). See also *Hughes v. Montgomery Contracting Co.*, 189 Ga.

App. 814 (377 SE2d 723) (1989).

2. Defendant also contends this appeal must be dismissed on the ground that plaintiffs failed to file a Settlement Conference Information Form (hereinafter referred to as "SCIF") in violation of Court of Appeals Rule 52. However, Rule 52 (IV) (a) provides that the failure to timely file a SCIF by either party shall be deemed a rejection of the settlement conference procedure. Thus, this appeal is properly before this court.

3. In order to prevail on a claim for legal malpractice " 'the client has the burden of establishing three elements: (1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damage to the plaintiff. (Cits.)' [Cit.]" *Guillebeau v. Jenkins*, 182 Ga. App. 225, 229 (1) (355 SE2d 453) (1987). In the case sub judice we agree with the trial court that, although it is undisputed that an attorney/client relationship existed between plaintiffs and defendant, plaintiffs have failed to establish either negligence, or that the alleged negligence was the proximate cause of plaintiffs' damages.

The doctrine of judgmental immunity prevents the plaintiffs from establishing that defendant's recommendation to execute the release in favor of *Gallery* was a negligent act. In *Woodruff v. Tomlin*, 616 F2d 924, 930 (6th Cir. 1980), one of the seminal cases on judgmental immunity, the Sixth Circuit held: "[T]here can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule. Otherwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight. If this were permitted, . . . the original trial would become a 'play within a play' at the malpractice trial."

Georgia has adopted the doctrine of judgmental immunity, holding "the tactical decisions made during the course of litigation require, by their nature, that the attorney be given a great deal of discretion. [Cits.]" *Berman v. Rubin*, 138 Ga. App. 849, 851, n. 2 (227 SE2d 802) (1976). Moreover, the doctrine of judgmental immunity has been adopted in virtually every jurisdiction, prompting the Sixth Circuit in *Woodruff* to note, "[N]either counsel nor we have found an American decision holding an attorney liable for the choice of trial tactics or the good faith exercise of professional judgment." *Woodruff* at 930, n. 1. See, e.g., *Kirsch v. Duryea*, 578 P2d 935 (Cal. 1978); *Glenna v. Sullivan*, 245 NW2d 869 (Minn. 1976); *Rorrer v. Cooke*, 329 SE2d 355 (N.C. 1985).

Because the evidence of record clearly indicates that defendant assessed the relative strengths and weaknesses of the plaintiffs' claims against both *Gallery* and Mr. Gordon and exercised his best, in-

formed judgment prior to recommending that plaintiffs execute the release in favor of *Gallery*, any error or mistake in judgment by defendant as to this recommendation is protected by the doctrine of judgmental immunity and may not serve as the basis for a legal malpractice action against defendant. Accordingly, plaintiffs have failed to meet the burden of establishing defendant's negligence in his representation of plaintiffs.

Plaintiffs have also failed to establish that defendant's actions caused the alleged injury to plaintiffs. "There are few rules of law more fundamental than that which requires a party to read what he signs and to be bound thereby. [Cits.] This rule has particular force when the party is well educated and laboring under no disabilities. To hold otherwise is to create the potential for malpractice litigation in every contract dispute." *Berman v. Rubin*, supra at 854. The release executed by the plaintiffs in favor of *Gallery* is written in plain "layman's" English and is completely devoid of technical language and legal jargon. It covers only one-and-one-half pages and unambiguously releases *Gallery* "from any and all causes of action and claims for relief of any nature whatsoever, known and unknown, anticipated and unanticipated, past, present and future" resulting from *Gallery's* publication of the nude photograph of Ms. Hudson. Moreover, the record clearly indicates that both plaintiffs read the release they executed, understood the legal consequences of the release before executing it, and made a decision to execute the release so that they could immediately obtain the forged entry form submitted to *Gallery* and pursue immediate action against Mr. Gordon.

"[W]hen the document's meaning is plain, obvious, and requires no legal explanation, and the client is well educated, laboring under no disability, and has had the opportunity to read what he signed, no action for professional malpractice based on counsel's alleged misrepresentation of the document will lie." *Berman v. Rubin*, supra at 855. We agree with the trial court's conclusion that the "[p]laintiffs made an independent, well-informed and deliberate decision that, in retrospect, they now regret and desire to rescind. Thus, [p]laintiffs' choice to execute the release is an intervening event which caused their alleged damages. . . ." Compare *Little v. Middleton*, 198 Ga. App. 393 (401 SE2d 751) (1991) cited by plaintiffs, where a question of fact existed as to whether the client had a subjective understanding of the preclusive effect of the release executed.

Because plaintiffs failed to establish two of the three elements necessary to prove a legal malpractice claim, the trial court was correct in granting summary judgment to defendant. *Rogers v. Norvell*, 174 Ga. App. 453, 458 (2) (330 SE2d 392) (1985).

*Judgment affirmed. Birdsong, P. J., and Cooper, J., concur.*

888

*Michael T. Bennett, Robert J. Morrison*, for appellants.
*Arnall, Golden & Gregory, Karen B. Bragman, Frank N. White*, for appellee.