**SECOND DIVISION**
**BARNES, P. J.,**
**RICKMAN and SELF, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 16, 2017**

# In the Court of Appeals of Georgia

A16A1871. ENGELMAN v. KESSLER et al.

A16A1872. KESSLER et al. v. ENGELMAN.

RICKMAN, Judge.

In these consolidated appeals, we must determine whether the trial court properly granted summary judgment in part, and denied it in part, in this case filed by a client, Andrea Engelman, against her former attorneys, Randall Kessler, Louis Tesser, Darren Tobin, (collectively,"the attorneys") and her former law firm, Kessler, Schwarz and Solomiany, P.C. ("KSS"). The attorneys and KSS represented Engelman in a divorce action. Approximately three years after signing a settlement agreement in her divorce case, Engleman filed a lawsuit against the attorneys and KSS, alleging legal malpractice and breach of fiduciary duty/fraud. The trial court granted summary judgment in favor of the attorneys and KSS on Engelman's claim for legal

malpractice. Both parties' motions for summary judgment on Engelman's breach of fiduciary duty/fraud claim were denied.

For the following reasons, we affirm the trial court's grant of summary judgment to the attorneys and KSS on Engelman's claim for legal malpractice. We vacate the trial court's denial of summary judgment on the breach of fiduciary duty/fraud claim and remand for proceedings consistent with this opinion.

> To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the evidence and all reasonable inferences and conclusions drawn therefrom, viewed in the nonmovant's favor, warrant judgment as a matter of law. We review de novo the trial court's ruling on a motion for summary judgment.

(Citation and punctuation omitted.) *Hart v. Sirmans*, 336 Ga. App. 212 (784 SE2d 67) (2016).

So viewed, the record shows that prior to marrying her former husband, Engelman, a college graduate, signed a prenuptial agreement. At some point during the marriage, Engelman suspected that her former husband planned on seeking a divorce. Engelman did not want a divorce but she met with Tobin because she wanted the attorneys to look at the prenuptial agreement. A few months after their initial

meeting, Engelman retained the attorneys and KSS. Engelman signed a one-page legal services employment agreement.

The legal services employment agreement provided that Engelman would pay "$25,000 now as a general retainer to preclude adversaries from hiring KSS in this matter and for KSS to be available and 'on call' to represent [Engelman]. . . . Retainers are earned when paid. Refunding funds not accounted for by time or expenses is in KSS' sole discretion." While there is a handwritten note on the agreement that states, "$15,000 to start representation," Engelman actually gave the attorneys and KSS a check for $20,000 to begin representation. The hourly rates for each attorney in the firm were listed in the legal services employment agreement along with the caveat that the rates were "subject to increases."

On the day after Engelman retained the attorneys and KSS, Kessler sent an interoffice e-mail which stated that the attorneys' hourly rates would be increasing. Kessler requested that a memo be sent to all of KSS's clients to inform them of the rate change. Engelman denied that she ever received this memo. Engelman did receive billing statements from KSS and she acknowledged that on the statements the rates for each attorney were clearly listed.

Engelman believed that her former husband was wealthy but she was not aware of his exact income. The attorneys advised Engelman that they would send a businesses valuation expert a copy of the prenuptial agreement in order to get an opinion regarding whether her former husband's new businesses could be considered marital property and, thus, be exempt from the prenuptial agreement. The attorneys and Engelman's former husband's attorney began to communicate about the potential divorce case and the prenuptial agreement; the attorneys expressed an interest in trying to settle the case.

On February 5, 2010, Engelman's former husband's attorney sent Tesser a settlement offer. On February 8, 2010, a KSS paralegal sent an email to Engelman with the settlement offer attached and indicated that after she read the offer she should call Tesser or Tobin to discuss it. On February 10, 2010, Engelman sent an email to Tesser, Tobin, and the paralegal which stated, "I am working on two different agreements for you and I to go over at your earliest convenience." On February 18, 2010, Tesser sent a letter to Engelman which stated that she "should seriously consider accepting the offer." The letter went on to analyze the potential enforceability of the prenuptial agreement and also detailed what the attorneys believed was the strongest argument to have the prenuptial agreement declared

invalid. The letter stated that its intent was not to "push" Engelman into accepting the offer and that the attorneys would "zealously advocate" on her behalf should she decide to decline the offer.

On February 23, 2010, at 11:35 pm, Engelman sent the attorneys an email detailing a counteroffer she wanted them to make to her former husband's attorney. Nine minutes later, Kessler sent a reply email to Engelman stating, "We will look at this and talk. We can do as you wish, but given that any response other than 'accepted' may remove the offer from the table for good, perhaps we should arrange a meeting/mediation. . . . I also want to compare your email with their offer very carefully." Engelman responded that she was working on the settlement agreement with the help of her family therapist. On February 24, 2010, Engelman sent another email to Kessler and attached her proposed counteroffer. The following day, Engelman sent an email to the attorneys in which she expressed her displeasure that she had not received a phone call in the 24 hours since her last email and stated that, "I need for that counter offer to be presented to [her former husband's] lawyer as soon as possible."

After speaking with Engelman and her family therapist on the phone, Tobin sent an interoffice email to Kessler detailing the terms of the offer that Engelman

5

wanted the attorneys to present to her former husband's attorney and noting that Engelman insisted that she be provided with a copy of the offer to review by the following day. Kessler replied to Tobin that he "hate[ed] that so be sure she knows there is risk and my perfrence [sic] is to get all parties together before we counter." Tobin sent an email to Engelman reflecting Kessler's concerns:

> We understand your desire to resolve this asap. However, [Kessler] still would prefer that we get [Engelman's former husband] and his attorney to sit down with us and try and negotiate a better deal. We will of course proceed with sending them your proposal but we wanted to make you aware of our preference to try and have a meeting with them first. Who knows, there may be more we can get out of him. [] In any event we will draft the offer and have it ready for you tomorrow. A meeting between all of us would allow us to explore all options.

Kessler also sent an email to Engelman urging her to agree to meet with her former husband and his attorney in person. Engelman responded that she wanted the attorneys to "[p]lease send the counter" and noted that "[y]ou all seem to think I can't get better." Kessler responded that "[i]t's not that we can't make a good argument for more, it's just that there is a big risk involved and it would be a significant one." Engelman replied that she "can't risk loosing [sic] this offer."

6

Tesser sent Engelman an email explaining that the attorneys would draft a proposed settlement offer for her to review and expressed an understanding that she was ready for the divorce to be over. Tesser also stated that, "while I think that there is a possibility that you could do better, by and large, what seems to be on the table significantly beats the terms of the prenup, which we believe would probably be enforced." A proposed settlement agreement was emailed to her and after a back and forth discussion regarding terms with the attorneys she sent an email to the attorneys that stated that the offer was "PERFECT!!!" and requested that they "[g]o for it asap[.]" In the following days, she sent emails to the attorneys stating, "[p]lease let me know you . . . are taking care of [an omission from the agreement] ASAP," "Did it go out? Please say yes[,]" and "end this ASAP! I need to close on a house hopefully in 30-45 days."

During the finalization of the settlement agreement, Engelman again stressed that she needed to get the agreement signed because she needed to close on a house. Upon receipt of the proposed final agreement by Engelman's former husband's attorney, Engelman sent an email to Tobin and Tesser expressing her desire to sign the agreement the following day because "I am closing on a house . . . and need the money to close." Tobin sent Engelman an email explaining that it was in her best

7

interest to slow down, carefully look at the agreement, and urged her to move back the date of her closing. Tobin concluded the email by stating, "[p]lease do not worry - Tesser and I want to ensure that you get everything that you discussed and that you deserve. Now, I would like you to please print the Agreement, read it and find your questions/revisions."

The billing statements Engelman received from KSS reflect that the attorneys' rates were raised during her case. Engelman was in possession of two final invoices, both bearing the same invoice number. The invoices were dated April 29, 2010 and September 7, 2010. The September invoice reflected a higher amount of money owed than the April invoice. Engelman requested a refund because her final bill reflected a balance in her account. In October 2010, KSS issued her a refund.

Engelman argues that the attorneys and KSS committed legal malpractice by failing to explain the terms of the prenuptial agreement and by not reviewing any of her former husband's financial documents prior to advising her to seriously consider accepting the proposed settlement offer. Engelman's breach of fiduciary duty and fraud claims center around the legal services employment agreement which she argues was in violation of the Georgia Rules on Professional Conduct and several Formal Advisory Opinions and the fact that Engelman was charged higher rates than

the rates specified in the employment agreement. As a result of the alleged negligence, breach of fiduciary duty and fraud, Engelman claims that she did not receive "fair value or equitable division of property" as part of the settlement agreement and that she was overcharged, resulting in damages exceeding $4 million. The trial court granted summary judgment to the attorneys and KSS on Engelman's claim for legal malpractice. The trial court denied both parties' motions for summary judgment on Engelman's claim for breach of fiduciary duty/fraud. For the following reasons, we affirm the trial court's grant of summary judgment to the attorneys and KSS on Engelman's claim for legal malpractice. We vacate the trial court's denial of summary judgment on the breach of fiduciary duty/fraud claim and remand for proceedings consistent with this opinion.

*Case No. A16A1871*

1. Engelman contends that the trial court erred by granting summary judgment to the attorneys and KSS on her legal malpractice claim. Specifically, Engelman argues that the trial court erred in holding that the attorneys and KSS were protected by the "judgmental immunity" doctrine.[1] We disagree.

_____

[1] Engelman claims that the trial court erred by not addressing all of the alleged breaches of the standard of care raised by her experts. However, the record shows that the trial court addressed each of the breaches of standard of care posited by Jan

"In order to prevail on a claim for legal malpractice the client has the burden of establishing three elements: (1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damage to the plaintiff." (Citation and punctuation omitted.) *Hudson v. Windholz*, 202 Ga. App. 882, 886 (3) (416 SE2d 120) (1992).

> Under the Georgia doctrine of judgmental immunity, there can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule. Otherwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight. If this were permitted, the original trial would become a "play within a play" at the malpractice trial.

---

McKinney. As to Engelman's claim that the trial court erred by not considering the expert opinion of Alan Mullinax, her attorney suspended his deposition and later sent an email to counsel for the attorneys and KSS confirming that, "[w]e will not be using Alan Mullinax as a trial expert in this case." Regarding Clark Cunningham's opinion, he deposed that he was not asked to give "an expert opinion on legal malpractice" and he acknowledged that he was not "giving opinions . . . relating to whether [KSS and the attorneys] violated the standard of care." He further deposed that he "was not offering an opinion that the hourly rate charged either in the employment agreement or subsequently was unreasonable. . . . [and] he would be cautious to offer such an opinion. I think that opinion is better offered by an expert in the practice area, which I am not."

10

(Punctuation and footnote omitted.) *Mosera v. Davis*, 306 Ga. App. 226, 232 (2) (701 SE2d 864) (2010).

The record clearly indicates that the attorneys and KSS analyzed the terms of Engelman's prenuptial agreement and advised her as to the strengths and weaknesses regarding the enforceability of the agreement. In the letter sent to Engelman which advised her to "seriously consider accepting the [settlement] offer," the attorneys explained, inter alia, that:

> If you instruct us to engage in discovery and retain experts, our best hope is that we will be able to show that one or more of [Engelman's former husband's] businesses were started during the marriage, and also that the businesses(es) do not fall under the umbrella of his separate property. This would make the business(es) subject to equitable division which obviously increases what you would otherwise be entitled to receive.

This letter runs contrary to Engelman's claim that she was never advised that she may be able to receive more than alimony under the terms of the prenuptial agreement. While the attorneys and KSS explained that it "[would] not necessarily be easy" to show that her former husband's businesses were marital property, Engelman was certainly informed that there were avenues for her to receive more money under the prenuptial agreement or, in the alternative, that the prenuptial agreement could

11

possibly be invalidated. Moreover, prior to Engelman even receiving this letter, she was already working on another settlement offer with her therapist.

Approximately three weeks after receiving the first settlement offer, Engelman had a counteroffer ready that she wished the attorneys to present to Engelman's former husband's attorney. Despite concerns from the attorneys about the counteroffer, Engelman demanded that the counteroffer be presented and did not heed the advice from the attorneys that she meet with her former husband and his attorney in person prior to presenting a counteroffer. Throughout the process of presenting the counteroffer and the drafting of the proposed settlement agreement Engelman urged the attorneys to move at a faster pace while the attorneys expressed how important it was to slow down "to ensure that [she] get[s] everything that [she] discussed and that [she] deserve[s]."

Under the facts and circumstances of this case, the trial court correctly concluded that KSS was entitled to judgmental immunity. See *Hudson*, 202 Ga. App. at 886-887 (3) ("Because the evidence of record clearly indicates that defendant assessed the relative strengths and weaknesses of the plaintiffs' claims . . . and exercised his best, informed judgment prior to recommending that plaintiffs execute the release . . . any error or mistake in judgment by defendant as to this

recommendation is protected by the doctrine of judgmental immunity and may not serve as the basis for a legal malpractice action against defendant."); see also *Mosera*, 306 Ga. App. at 230-233 (2). Accordingly, Engelman has failed to establish negligence on the part of the attorneys or KSS.

Furthermore, Engelman also failed to establish that the attorneys' actions were the proximate cause of her alleged damages. Engelman voluntarily signed the divorce agreement, which she negotiated and begged her attorneys to get ready for her to sign. As detailed above, Engelman insisted on going forward with presenting a counteroffer to her former husband's attorney in spite of the advice from the attorneys to slow down and try to mediate. Kessler felt that this decision to not follow his advice was so significant that he urged Tobin to put in writing for Engelman the risks of sending the counteroffer. Throughout the negotiations regarding the proposed settlement agreement, Engelman continued to communicate to the attorneys that it was urgent the settlement agreement get finalized because she needed the money she would receive from the divorce in order to buy a house. Tobin even tried to get Engelman to move back her closing date on the house because it was in her best interest to slow down.

13

There are few rules of law more fundamental than that which requires a party to read what he signs and to be bound thereby. This rule has particular force when the party is well educated and laboring under no disabilities. To hold otherwise is to create the potential for malpractice litigation in every contract dispute.

(Citation and punctuation omitted.) *Hudson*, 202 Ga. App. at 887 (3).

The settlement agreement plainly states that Engelman is signing the agreement "without conducting the usual discovery and without disclosure of the income and assets of the other." Engelman initialed that she "acknowledge[d] that she [] read each page of th[e] Agreement carefully before signing same; that she [] obtained legal counsel of her own choosing and such legal counsel's services have been satisfactory and adequate." Engelman voluntarily settled her divorce and failed to follow the advice of her attorneys who opined that mediating the case or meeting with Engelman's former husband's attorney in person could lead to a more favorable settlement. "[Engelman] made an independent, well-informed and deliberate decision that, in retrospect, [she] now regret[s] and desire[s] to rescind. Thus, [Engelman's] choice to execute the [settlement agreement] is an intervening event which caused [her] alleged damages." *Hudson*, 202 Ga. App. at 887 (3).

Thus, we affirm the trial court's grant of summary judgment to the attorneys and KSS on Engelman's legal malpractice claim. See *Mosera*, 306 Ga. App. at 230-233 (2); see also *White v. Rolley*, 225 Ga. App. 467, 468-469 (2) (484 SE2d 83) (1997); *Hudson*, 202 Ga. App. at 886-887 (3).

2. Engelman contends that the trial court erred in denying her motion for summary judgment as to her claim for breach of fiduciary duty/fraud.

"It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." (Citation and punctuation omitted.) *Nash v. Studdard*, 294 Ga. App. 845, 849-850 (2) (670 SE2d 508) (2008). "In order to prove fraud, the plaintiff must establish five elements: (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." (Citation omitted.) *Sun Nurseries, Inc. v. Lake Erma, LLC*, 316 Ga. App. 832, 835 (1) (730 SE2d 556) (2012).

The trial court held that genuine issues of material fact exist as to the breach and damage elements of Engelman's claim for breach of fiduciary duty and all five elements of fraud. The trial court found that both parties' experts disagreed as to

15

whether the atttorneys' and KSS's legal services employment agreement violated the Georgia Rules of Professional Conduct and certain Formal Advisory Opinions.

The threshold issue for Engelman's breach of fiduciary duty/fraud claim is whether or not the terms of the legal services employment agreement violate Georgia law. "The construction of a contract is peculiarly well suited for disposition by summary judgment because, in the absence of an ambiguity in terms, it is a question of law for the court." (Footnote omitted). *Tucker Materials (GA), Inc. v. Devito Contracting & Supply, Inc.*, 245 Ga. App. 309, 310 (535 SE2d 858) (2000). See *Precision Planning Inc. v. Richmark Communities Inc.*, 298 Ga. App. 78 (679 SE2d 43) (2009) ("The issues of contract construction and enforceability are generally questions of law for a court to resolve[.]") (citations and footnotes omitted). The question of whether a lawyer's retainer agreement violates public policy is a question of law. See *Brandon v. Newman*, 243 Ga. App. 183, 186 (3) (a) (532 SE2d 743) (2000). Because the question of whether or not KSS's legal services employment agreement was enforceable is a question of law, it was improper for the trial court to rely upon the parties' expert's opinions. See *Dow Chemical Co. v. Ogeltree, Deakins, Nash, Smoak & Stewart*, 237 Ga. App. 27, 29 (2) (514 SE2d 836) (1999) ("A matter of law is not the subject, or a proper subject, of expert testimony.") (Citation omitted).

16

Accordingly, we remand for the trial court to consider whether genuine issues of material fact exist with respect to Engelman's breach of fiduciary duty and fraud claims, without reference to expert opinion.

3. Engelman contends that the trial court erred in denying her motions to compel discovery from a nonparty. Each of the motions is relevant to Engelman's legal malpractice claim and because the trial court correctly granted summary judgment in favor of the attorneys and KSS on Engelman's claim for legal malpractice, the motions are now moot. See generally *Hackney v. American Prescription Providers of Ga., Inc.*, 258 Ga. App. 130 (572 SE2d 765) (2002).

*Case No. A16A1872*

4. KSS and the attorneys contend that the trial court erred by denying their motion for summary judgment on Engelman's breach of fiduciary duty/fraud claim. We need not address this issue due to our conclusion in Division 2.

*Judgment affirmed in part and vacated in part and case remanded. Barnes, P. J., and Self, J., concur.*