**FIFTH DIVISION
MCFADDEN, C. J.,
MCMILLIAN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 30, 2019**

# In the Court of Appeals of Georgia

A19A1193. JUSTIN SMILEY, AS ADMINISTRATOR OF THE PH-040
    ESTATES OF TERRI WHITE AND OF PAUL WHITE v.
    BLASINGAME, BURCH, GARRARD & ASHLEY, P. C. et
    al.

PHIPPS, Senior Appellate Judge.

Terri White and her husband[1] filed this action against Athens law firm Blagingame, Burch, Garrard & Ashley, P. C., and it managing shareholder, Henry Garrard, III, as well as the Savannah law firm Oliver Maner, LLP, and its partner Gregory Hodges (collectively, "Appellees"), seeking damages for legal malpractice, breach of fiduciary duty, and misrepresentation arising from the settlement of a product-liability case involving an implanted OBTape device manufactured by

---

[1] After the filing of their lawsuit, both Terri White and Paul White passed away. Justin Smiley, as administrator of the Estates of Terri White and Paul White, has been substituted as appellant in the instant case.

Mentor Worldwide, LLC ("Mentor"). The Whites appeal from the trial court's grant of summary judgment in favor of the Appellees. For the following reasons, we affirm.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. In this case, to satisfy the burden of proof on summary judgment, defendants were required to point out by reference to the record that there was an absence of proof adduced by [the Whites] on the issue of proximate cause.

(Citation and punctuation omitted.) *Szurovy v. Olderman*, 243 Ga. App. 449, 452 (530 SE2d 783) (2000).

After suffering injury from an implanted OBTape device manufactured by Mentor, Terri White and her husband engaged the law firm of Oliver Maner and its partner, Hodges, to represent her against Mentor. After signing the fee agreement, Oliver Maner then contacted the law firm of Blasingame, Burch, Garrard & Ashley ("Blasingame firm"), which was handling Mentor ObTape cases, and the two firms agreed to jointly represent the Whites. The new engagement agreement stipulated that

2

the Blasingame firm would receive a 40% contingency fee, and Oliver Maner would receive one-third of that amount.

Two days after the Whites' case was filed in Georgia federal court, the U. S. Multi-District Litigation ("MDL") panel ordered that all ObTape cases be sent to the Middle District of Georgia for coordinated pre-trial proceedings. See *In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*, 588 F.Supp.2d 1374 (J.P.M.L. 2008). The Blasingame firm had the majority of the ObTape cases in the MDL. During the MDL process, the Whites received regular status reports, understood what was happening in the litigation and were updated about what their attorneys were doing to prosecute the case.

When a group of cases selected by the MDL judge was ready for trial, the judge ordered four cases consolidated for a single "bellwether" trial in June 2010.[2] The Blasingame firm represented the bellwether plaintiffs. After five days of the bellwether trial, Mentor's counsel approached the Blasingame firm regarding

---

[2] "Bellwether trials are meant to produce a sufficient number of represented verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the case may have if resolution is attempted on a group basis." (Footnote omitted.) *In re Deputy Orthopaedics, Inc.*, 870 F.3d 345, 348-349 (I) (5th Cir. 2017).

settlement. An amount was agreed upon, and Garrard negotiated a resolution model with Mentor's counsel that included funds to evaluate each case individually and to come up with a settlement value for each of his firm's 101 individual cases within the parameters of the total settlement amount. The proposed resolution involved an initial payment and a potential additional payment contingent on whether an additional group of 39 cases could be "qualified." The proposed resolution model did not specify a particular number or a percentage of Blasingame firm's clients that had to agree with the settlement to make the agreement binding. However, the parties discussed an amount to be returned to Mentor if any Blasingame firm clients declined settlement. Garrard and Mentor's counsel reported the potential settlement to the MDL judge, explaining that only the bellwether clients had agreed to settle so far and that no agreements had been sought yet from any of the other plaintiffs in the MDL case.

On August 17, 2010, the Blasingame firm sent a letter to the Whites explaining the agreement with Mentor, and proposing an individual settlement. The letter explained that Mentor had offered to settle all of the Blasingame firm's cases, how the individual settlement proposals were allocated, and the criteria considered. The letter set forth the "total amount of settlement proceeds that we can distribute as of

4

now," and further stated that the total settlement amount was dependent on whether certain conditions relating to additional claimants were met, and that while no individual client's settlement would decrease, some claimants may receive an additional payment. The letter explained that "[a] settlement of your claim, if accepted by you, terminates your case and awards you money damages now," and that the client's signed release was necessary to consummate a settlement. The letter also described the procedure for allocating funds. It stated that the Blasingame firm and Garrard had reviewed each case and considered various objective factors. It stated that the firm "used a point system to help us get an objective look at each case, but we also considered matters that, based on our professional judgment, would affect valuation."

When Terri White received the August 17, 2010, letter, she contacted Garrard's paralegal and rejected the proposed settlement. The next day, Terri White spoke to Garrard and explained to him that she was "completely unwilling to accept the proposed settlement." Terri White then contacted another attorney, William Bell, to discuss whether to accept the settlement. Bell contacted Hodges to discuss the proposed settlement, and Hodges told Bell about the Mentor litigation and proposed settlement, which Hodges characterized as "fairly substantial." Bell also spoke to

Garrard, who invited Bell to meet with Garrard, Hodges and the Whites at their home to discuss an increased settlement. Bell declined.

On September 3 and 10, 2010, Garrard, Hodges and Garrard's paralegal traveled to Statesboro to meet with Terri White to convey an increased settlement offer. At that time, the attorneys explained the allocation method and the criteria used to calculate the increased settlement offer with the Whites. Garrard told the Whites what the lawyers had done to allocate more money to her case and explained that 19 additional cases had qualified, making an additional amount available. Terri White testified that she read the letter explaining the criteria used to allocate individual proposed settlements before accepting her proposed settlement. Terri White also testified that during this discussion, she asked the lawyers, "What's the top dollar here? How much is Mentor going to pay? How much is everybody else going to get?" Gerrard told the Whites the total settlement amount they had available to allocate at that time, and that she would be getting the "second highest amount of anybody."

The Whites accepted the increased settlement proposal during the September 10, 2010, meeting, signed a release, and were given a check for roughly half their settlement amount, representing their net at the time. Terri White never testified that she relied upon any of the Appellees' alleged misrepresentations in deciding to settle.

6

Paul White testified that he had no input in the decision-making process about whether to accept the settlement.

For about two years after the Whites' lawsuit was settled, the Blasingame firm and Oliver Maner continued to represent the Whites with respect to various medical liens and collection actions arising from medical bills and insurance subrogation claims.

After all of the MDL plaintiffs had signed releases, there was a remaining settlement amount to be allocated because more plaintiffs were qualified into the multi-district litigation. Garrard averred that "we went back and we made disbursements to some people who we thought had significant cases and gave them a little bit more money. We did that on a purely subjective basis." The Whites now argue that the extra funds remaining in the settlement after all the MDL plaintiffs signed releases were not allocated objectively by the Blasingame firm and Garrard, but rather in a manner which preferred those clients with whom the Blasingame firm was not obligated to split fees.

On August 29, 2014, the Whites sued Appellees for professional negligence, breach of fiduciary duty, malpractice and misrepresentation. Appellees filed a motion for summary judgment, and the Whites filed a motion for partial summary judgment

on the issue of whether the settlement was aggregate. The trial court's summary judgment order noted that because it had to construe all evidence in the light most favorable to the Whites, as the nonmovants, it would assume for the purposes of summary judgment that "the underlying settlement with Mentor was an aggregate settlement, as there was a finite amount of money which was divided by [Appellees] among the various plaintiffs." The trial court then granted summary judgment in favor of Appellees.

1. The Whites' estate first argues that the trial court erred in granting summary judgment in favor of Appellees on the White's legal malpractice claim. We disagree.

The Whites' claims focus on the process and procedures by which the Appellees handled the settlement with Mentor. Their claims for legal malpractice are that (1) Appellees accepted a settlement without the Whites' knowledge or consent, which created a risk of a conflict of interest, (2) Appellees did not inform the Whites of the settlement offer before accepting it and did not fully disclose all material facts regarding the purported settlement, including the total amount ultimately paid by Mentor, and (3) Appellees did not disclose how they arrived at the particular net figure that the Whites ultimately received and did not disclose amounts that other plaintiffs received.

8

The trial court granted summary judgment in favor of the Appellees. In its order, the trial court noted that although the Whites "have presented enough evidence for a question of fact as to whether the actions of [Appellees], if taken as true, violated a legal standard of care[,]" their claim still did not survive summary judgment because the Whites have not shown any damages proximately caused by the breach.

"In a legal malpractice action, the plaintiff must establish three elements: (1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damage to the plaintiff." (Citation and punctuation omitted.) *Anderson v. Jones*, 323 Ga. App. 311, 315 (1) (745 SE2d 787) (2013). To establish proximate cause, the plaintiff "must show that but for the attorney's error, the outcome would have been different; any lesser requirement would invite speculation and conjecture. The defendant attorney is entitled to summary judgment if he shows that there is an absence of proof adduced by the client on the issue of proximate cause." (Footnote omitted.) *Mosera v. Davis*, 306 Ga. App. 226, 230-231 (2) (701 SE2d 864) (2010). "These requirements also pertain to malpractice suits arising from settlement negotiations." (Citations and punctuation omitted.) *Szurovy* 243 Ga. App. at 452

9

(affirming a grant of summary judgment for a legal malpractice defendant when the plaintiff "failed to show that she could have negotiated a better agreement or that she would have obtained better results at trial"). Accord *Hudson v. Windholz*, 202 Ga. App. 882, 887 (3) (416 SE2d 120) (1992) (affirming summary judgment to defendant on plaintiff's legal-malpractice claim that attorney had improperly advised them to settle their case and did not explain the consequences of settlement because plaintiffs could not prove causation or damages).

In *Mosera*, this Court affirmed the trial court's grant of summary judgment for the defendant attorney in a legal malpractice action arising from the attorney's settlement of a civil action on the grounds that the client "could not prove proximate cause and damages, because he failed to show that a better settlement offer was obtainable or that a better outcome would have been achieved had the underlying litigation proceeded to trial[.]" *Mosera*, 306 Ga. App. at 230. This Court explained that summary judgment in favor of the defendant attorney was warranted because the client "has not shown how any of the alleged [acts of legal malpractice] harmed her in any way," and "[n]either of [the client's] experts explained how [the client] was harmed by these alleged errors." (Footnote omitted.) Id. at 231 (2).

*Anderson,* supra, also involved allegations of legal malpractice and breach of fiduciary duty against an attorney who represented the plaintiff and three family members in a settlement of their personal injury claims. The plaintiff, and the most seriously injured of the four settling family members, argued that the defendant attorney had a conflict of interest in negotiating a lump sum settlement and allocating the settlement proceeds between the four claimants. The plaintiff claimed that the amount of her settlement was insufficient in light of the severity of her injuries. 323 Ga. App. at 314. This Court held that

> [e]ven assuming that [the defendant] breached his fiduciary duty in his manner of settling [the plaintiff's] claims, [the plaintiff] is unable to recover for legal malpractice because she is unable to show that she was damaged by such breach. There is no evidence that a $1.75 million settlement . . . was inadequate, or that [the plaintiff] would have likely obtained a greater settlement if she and her parents had been represented by separate legal counsel.

(Footnote omitted.) Id. at 316-317 (1) (a). The *Anderson* court specifically noted that the plaintiff's own expert testified that, based solely on the merits of the plaintiff's case, it would not be his opinion that $1.75 million was an unfair settlement. Id. at 317 (1) (a), n. 8.

Here, as in the cases cited above, there can be no recovery as a matter of law because the Whites cannot show that the Appellees' alleged breach proximately caused any damage or that the settlement was inadequate. The Whites argue that their claims arise from the under-allocation of the settlement funds. However, they have not cited to any issue of fact indicating that they would have received a larger settlement if their attorneys had not breached their duty towards them. Further, the Whites' assertions that they should have received additional compensation are merely speculative. "A legal malpractice claim cannot be based upon speculation and conjecture." (Citation omitted.) *Anderson*, 323 Ga. App. at 316-317 (1) (a)

Although the Whites' experts testified that the Appellees breached the applicable standard of care, they did not opine as to whether the Whites should have received a larger settlement or whether the Whites' claim was worth more than they received. In contrast, the Appellees' expert opined that the Whites' settlement was "a monstrous settlement," "a great result," and "a lot more than what most people get."

The Whites argue that their damages could be calculated in several ways: (1) they should be awarded the same dollar-per-points amount as the most highly compensated plaintiff; (2) that since the Appellees told Terri White that she was to receive the second-highest allocation, she should be placed in that position; and (3)

12

that the additional amount allocated by Appellees after she signed her settlement agreement should be allocated by comparing her settlement to those received by other plaintiffs.

The damages cannot be proven by comparing the Whites settlement with the settlement received by the other Blasingame firm plaintiffs. Even the Whites' own expert testified that what the other plaintiffs received under the terms of the settlement agreement should not affect what is a fair and reasonable settlement of Terri White's case because "[e]very case has its own facts." The Whites' expert also explained that other considerations played into each plaintiff's settlement, including venue, judgment collectability, and potential appeal rounds. Further, the Whites had been told both in writing and in person, at the time they signed their settlement agreement, that the settlement allocation was not done on a purely objective basis.[3]

---

[3] The August 17, 2010, letter sent to White by Blasingame firm stated the following "[p]rocedure for allocation of funds. . . . [W]e have reviewed your case using our professional judgment and experience. To make this judgment, we have considered many factors, including: age at implantation; number of surgeries; whether there was a concurrent infection or not, and the type of infection, if any; whether disfigurement existed from scarring; the current status of incontinence, if any; and some other similar factors. We used a point system to help us get an objective look at each case[.] . . . We have also considered, as we must, certain defenses that Mentor asserted, such as smoking, diabetes, weight, compliance with medical providers' instructions, and underlying problems not caused by ObTape."

Additionally, the settlement letter they were provided explicitly stated that the total amount of the settlement might change and that some plaintiffs may receive additional money.[4]

The Whites cannot say that they suffered damages under their "objective comparison" theory. White ultimately received the fifth highest settlement amount of the 101 plaintiffs represented by the Blasingame firm firm, and only the four bellwether trial plaintiffs received a higher amount. Thus, Terri White got the highest settlement amount of all the non-bellwether plaintiffs, despite not having the highest number of objective points among those plaintiffs. If the settlement allocation had been based solely on objective points, the Whites' objective points would have put her thirteenth out of the 101 Blasingame firm plaintiffs. Thus, if the settlement had been allocated purely on objective points, the Whites would have received less money and not more.

Because the Whites have failed to show that they could have negotiated a better settlement or that the settlement they received was inadequate, they have failed to

---

[4] Specifically, the letter stated that "[s]ome of the total amount of the settlement is dependent on us furnishing and Mentor accepting additional information relating to some of the claimants. This may affect the final total number but your distribution will not be reduced by that. Some may receive an additional payment but we do not know that at this time."

establish damages and proximate cause. As a matter of law, the claims are speculative. Importantly, "in the absence of any showing of harm, there is no evidence that any alleged negligence was the proximate cause of damage to the plaintiff[s]." *Szurovy,* 243 Ga. App. at 452.[5]

2. The Whites estate next argues that the trial court erred in holding that their breach of fiduciary duty claims were duplications of the legal malpractice and misrepresentation claims. We disagree.

The Whites' claim for legal malpractice is based on the same acts or failure to act that gave rise to their claims for breach of fiduciary duty and misrepresentation. The Whites' own expert even opined that the acts that gave rise to the legal malpractice and breach of fiduciary duty claims "completely overlap." Where, as here, the breach of fiduciary duty claim arises from the same source as the legal malpractice and misrepresentation claim (the attorney-client relationship), was

---

[5] Although the Whites cite to a Supreme Court of Mississippi case, *Waggoner v. Williamson*, 8 So.3d 147 (Miss S.Ct. 2009), we are not bound to follow cases from other jurisdictions. Even so, unlike in the instant case, the plaintiffs in *Waggoner* provided a non-speculative method to ascertain damages because they provided expert testimony as to the value of their claim and expert testimony that their injuries were worse than comparable plaintiffs by a certain dollar amount. Id. at 155-156 (17).

allegedly breached by the same conduct (the failure to disclose the additional settlement funds), and the damages flowing from each claim are no different from the alleged legal malpractice, Georgia law provides that the claims for breach of fiduciary duty and misrepresentation cannot be asserted separately. See *Anderson*, 323 Ga. App. at 318 (2); *Oehlerich v. Llewellyn*, 285 Ga. App. 738, 740-741 (2) (647 SE2d 399) (2007); *Griffin v. Fowler*, 260 Ga. App. 443, 445-446 (1)-(2) (579 SE2d 848) (2003).

3. As a result of our holdings in Divisions 1-2, we find that the trial court did not err by granting summary judgment in favor of the Appellees on the Whites' claims for attorney fees and punitive damages. Compare *Kahn v. Britt*, 330 Ga. App. 377, 392 (8) (765 SE2d 446) (2014).

*Judgment affirmed. McFadden, C. J., and McMillian, P. J., concur.*