**SECOND DIVISION
MILLER, P. J.,
ANDREWS and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 27, 2018**

# In the Court of Appeals of Georgia

A18A0339. BUSH v. AG SOUTH FARM CREDIT et al.

BROWN, Judge.

Terry L. Bush sued his insurance agent Sandra Meeks and her employer, AgSouth Farm Credit, ACA, an agricultural credit association and insurance broker (collectively, "defendants"),[1] for negligence, negligent misrepresentation, and fraud in connection with his purchase of a crop insurance policy. Bush sought compensatory and punitive damages. Defendants moved for summary judgment on all claims. The trial court granted the motion, and Bush appealed. For reasons that follow, we affirm the grant of summary judgment to AgSouth on Bush's claim for

---

[1] AgSouth is an agricultural credit association and a member of the Farm Credit System. While it brokers insurance policies for private companies in the crop insurance market, including Diversified Crop Insurance Services, Rain and Hail Crop Insurance Services, Inc., and Great American Insurance Group, it acts primarily as a lender.

punitive damages, but reverse the grant of summary judgment on all remaining claims.

"Summary judgment is appropriate when no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. On appeal, we review a trial court's summary judgment ruling de novo, construing the evidence and all reasonable inferences in the light most favorable to the nonmovant." (Citation omitted.) *Cottingham & Butler, Inc. v. Belu*, 332 Ga. App. 684, 685 (774 SE2d 747) (2015). So viewed, the evidence shows that Bush owns a 280-acre soybean and wheat farm.[2] The farm has been in Bush's family for many years and operated as a dairy farm. In 2010, Bush bought beef cows through a loan with AgSouth. As part of his dairy and cattle operations, Bush grew wheat and "planted it back for grazing and hay and stuff."

In 2011, Bush began planting wheat and soybean as commodity crops. When Bush got into "row cropping," he took out several loans from AgSouth in order to purchase farm machinery and equipment. After he obtained these loans, his contact at AgSouth recommended that he get crop insurance in case of a weather-related crop

---

[2] Bush farms a total of 800 acres, which includes his 280-acre farm as well as neighboring land owned by his deceased brother's family and another farmer.

loss. Bush had heard about crop insurance and agreed that he needed it, but told his contact that he knew nothing about crop insurance or anybody who "writes it." The contact put Bush in touch with Meeks, who has been a licensed crop insurance agent with AgSouth since 2000. Meeks "write[s] with" Diversified, Rain and Hail, and Great American.

When they met in February 2011, Meeks told Bush she sold crop insurance for Diversified. At that time, Bush told Meeks where he obtained his grain and that he had never sold crops commercially before 2011, using it only as feed or seed to replant. Bush could not recall additional details of this initial conversation with Meeks or any subsequent conversations, but he recalled that Meeks "handled all" of the production history calculations, presumably from weight tickets he had provided to her. As a result of their meetings, Meeks procured crop insurance from Diversified for Bush's 2011 soybean crop and his 2012 wheat crop.

Meeks testified that Bush had a "continuous policy" for wheat with an actual production history ("APH") of 75 bushels per acre, which Meeks calculated based upon what Bush told her that he produced for the four years prior to 2012.[3] Meeks did

---

[3] The insurance policy at issue defines "Actual Production History" as a "process used to determine production guarantees in accordance with 7 CFR part 400, subpart (G)." It defines "actual yield" as "[t]he yield per acre for a crop year

not ask Bush for documents supporting these amounts and explained that Bush was not required to submit such documentation with his insurance application, but she warned him – as she warns all of her clients – that if he was ever audited he would "have to document" what was reported in the insurance application. At the time Meeks procured the policy, she did not know if Bush would be farming crops for the first time, and she did not ask him. But, according to Meeks, Bush would not qualify as a "new producer" because he gave her "four years of production." During her deposition, Meeks confirmed that she was familiar with both the federal regulations governing APH and the " Crop Insurance Handbook," and acknowledged that she had never read the latter from front to back because it is "huge." Meeks explained that the Crop Insurance Handbook "gives you the rules on how to do anything, any reporting that you would do . . . . It would have a section for . . . records for production, for

___

calculated from the production records or claims for indemnities. The actual yield is determined by dividing total production . . . by planted acres." The APH is calculated by taking a minimum of four years of total production and dividing each year of production by the total number of acres farmed. According to Meeks, it is a "simple average." As best we can tell from the record, under multi-peril crop insurance policies, farmers are given a payout based upon either the APH or a transitional yield. If a parcel does not have farming history sufficient to establish an actual yield, then the guaranteed yield is set by the government and known as the transitional yield, "T-yield," or "county yield." The T-yield is different for every county and was around 30 for wheat in Bush's county. If Meeks had used the T-yield to establish production in Bush's case, it would have been "65 percent of 30."

acreage, it would identify how to handle different things for blueberries, for pecans, for different crops." She further agreed that it sets "forth rules governing the issuance of [crop insurance] policies" and that she referred to it several times a year to refresh her memory if she had not done something in a long time or if she had a question about how to handle "any specific thing." Specifically, Sections 14 and 15 set forth "the approved production records, when you have to submit the production records" in the event of an audit. Meeks also read and agreed that a portion of the handbook provides that the insurance agent will

> assist the insured in the completion of . . . [the] APH report and [will] calculate that preliminary yield based on what that insured has given [the agent] for his yields and . . . I'm going to review it and make sure that it's correct as to what the insured told me and establish and update APH databases. . . . You have to have an APH established to have coverage. So when you report your acres, it's based – coverage is based on the acres times the APH times the coverage level.

Meeks knew that Bush had loans with AgSouth.

For his part, Bush did not know that Meeks worked for AgSouth. Their first meeting took place in his farm house, and she told him she sold crop insurance for Diversified. At that meeting, Bush recalls that Meeks asked him if he had ever sold crops and he said "no[,] we always fed it back to the cows." Specifically, Bush recalls

5

informing Meeks that he previously had been in the dairy cow and beef cattle business and had only combined wheat in order to harvest enough seed to replant grazing fields for his cattle the following year. With regard to the insurance application, Bush testified that Meeks "handled all" of the production history calculations and that he did not know if the APH of 75 bushels of wheat per acre listed on the application was accurate or not. According to Bush, he provided the "weight tickets" which Meeks used to calculate the "total production" amounts, and he never double-checked the numbers. He also explained to her that he only "combined enough wheat to fill up a grain bin that [he] rented from Eddie Smith one time each year. If the field that was combined for grain produced more than Smith's grain bin would hold, the remainder of the grain was fed to the cows." Smith's grain bin held 5,000 bushels and each year, Bush "combined a field that was about 40 acres or a field that was about 60 acres to get [his] seed."

The application requested 60 percent coverage, and Bush testified that he left it up to Meeks "to decide" the amount, but did not object "to it when [he] signed [the application]." Bush did not read the insurance application or the production and yield report on which Meeks calculated the APH, and he did not ask any questions about either document, but could have if he wanted to. He also did not recall having a

6

conversation with Meeks about the importance of record keeping. Bush believed Meeks to be an expert in crop insurance, and he relied on and trusted her to make all the decisions regarding his crop insurance.

Bush signed the insurance application, certifying that "to the best of my knowledge and belief all of the information on this form is correct. . . . I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy. . . ." Bush also signed the production and yield report, certifying the correctness of that information as well as acknowledging that "this form may be reviewed or audited and that information inaccurately reported or failure to retain records to support information on this form may result in recomputation of the APH yield." When Bush received the insurance policy and other related documents from Diversified, he put them directly in a file or "st[u]ck them in a cabinet" without reading them.[4]

---

[4] Bush had a Common Crop Insurance Policy which insured his wheat crop to the extent of 60 percent of his APH. Under the policy, Bush had a deductible of 40 percent. The record indicates the policy covered 561.1 acres planted in wheat. As noted previously, the listed APH was 75 bushels per acre with a price election of $8.09 per bushel. A full crop would have been 42,082.5 bushels (561.1 acres multiplied by 75 bushels per acre). A full crop would have grossed $340,447.43 (42,082.5 bushels multiplied by $8.09).

For crop year 2012, Bush planted over 600 acres of wheat and conducted his farming operations based on Meeks' representation that the wheat was insured at the coverage level stated in his policy. In July of 2013, he suffered a complete loss of his wheat crop because of excessive moisture. Bush called Meeks to report the loss, and Diversified sent an adjuster to examine the crop and calculate the loss. Bush received approximately $102,986 from Diversified, which he then assigned to AgSouth to pay down an existing loan. In July 2014, Meeks learned that Diversified was performing an audit of Bush's claim. Shortly thereafter, Diversified notified Bush that "upon completion of the review" of his acreage and production records, "a reduction in production and yields for specific units was applied" resulting in an overpayment of $102,986.[5] Diversified demanded repayment, instructing Bush that he must remit the balance in order to remain eligible in the crop insurance program. Bush has not repaid Diversified, and he no longer has crop insurance.

Bush filed his complaint against AgSouth and Meeks on May 9, 2016, alleging that Meeks held herself out as a crop insurance expert and that he relied on that expertise and Meeks' representations to establish his farming plan. Bush claims that

[5] In their respective appellate briefs, the parties explain that Diversified reduced Bush's APH to 65 percent of the County T-yield – or 28 bushels per acre instead of 75 – resulting in no insured loss.

8

AgSouth, as Meeks' employer, is vicariously liable for her actions. Among his claims, Bush asserts that defendants owed him a duty to issue crop insurance that complied with the rules and regulations of the federal crop insurance program and that they negligently misrepresented "that the policy would provide more insurance coverage than it actually provided." Bush also alleges that he justifiably relied on "Meeks' and AgSouth's decision to issue the policy using an APH that Meeks and AgSouth, but not Bush, knew to be incorrect," that they knew the APH was not in compliance with rules and regulations of the federal crop insurance program, and that their actions were taken to help assure that Bush would be able to repay loans made to him by AgSouth.

Bush seeks damages of at least $145,458.33, attorney fees, and punitive damages, contending that because of defendants' actions and his ineligibility for crop insurance, he lost the ability to operate his farm in 2015 and 2016, had to sell all of his cattle, and was forced to lease his land and equipment to another farmer.

Defendants moved for summary judgment, arguing that Bush was obligated to read the policy and, if he had, he would have known that documentation was required to support the claimed APH. The trial court granted the motion, finding as follows:

9

It is undisputed that the reason [Bush's] claim ultimately failed . . . was because [he] was unable to produce documents, not because [he] relied on [Meeks'] calculations of the APH inserted on the policy. . . . [T]he responsibility for creating and maintaining supportive records here lay with [Bush], not on the exercise of some expertise or discretion on his behalf by [d]efendants. . . . All [Bush] had to do was to read the policy and other documents and any layperson could have clearly underst[ood] that documentation would be needed to support the claim.

In so ruling, the trial court found that the harm befalling Bush was premised not on his reliance on Meeks' expertise but on his own "pattern" or "general policy of not reading documents that affect his farming enterprise." This appeal followed.

1. Bush first argues that the trial court erred in failing to consider his timely filed supplemental brief after oral argument.[6] Defendants argue that (a) the trial

[6] At the conclusion of the May 4, 2017 hearing on the motion for summary judgment, the trial court granted defendants' request to brief the issue of whether Meeks was a "verifier" according to the Crop Insurance Handbook and gave Bush two weeks to respond. Defendants filed their supplemental brief on May 12, 2017. The trial court issued its summary judgment order on May 26, 2017, the same day Bush filed his response to defendants' supplemental brief.

During the hearing, Bush argued that Meeks is a "verifier" as defined in the Crop Insurance Handbook. As a verifier, Meeks is required to obtain records or at least confirm that records exist to support the APH listed in an insurance application. In their supplemental brief, defendants argued that Meeks is not a verifier as defined by the handbook because she is not a "'legal entity . . . which has entered into a Standard Reinsurance Agreement with FCIC for the applicable reinsurance year.'" But, even if Meeks is a verifier, defendants argued that she was not required to obtain

court's failure to consider the supplemental brief is irrelevant because this Court conducts a de novo review and (b) Bush could have filed a motion for reconsideration when he discovered the alleged error. We need not reach this argument, however, given our conclusion in Division 2, infra.

2. In several related enumerations of error, Bush contends that the trial court erred in granting summary judgment to defendants because there exist genuine issues of material fact and the trial court misapplied the law. Specifically, Bush argues that the trial court ignored and/or misapplied the exceptions established by *Rain & Hail Ins. Svcs. v. Vickery*, 274 Ga. App. 424, 431 (2) (618 SE2d 111) (2005) to the rule that an insured must have read his insurance policy to have a claim against his insurance agent. Bush points out that the trial court's ruling "ignores the complexity of crop insurance and the need for expert advice to understand policy terms as well as what documents would qualify as 'written verifiable records' under section 13 of the Crop Insurance Handbook."[7] Defendants contend that the exceptions do not apply

any records from Bush.

---

[7] In a related argument, Bush contends that defendants harmed him by not using an APH based on written verifiable records in violation of the requirements set out by the Crop Insurance Handbook. Defendants' response that this Court should disregard this argument because the Crop Insurance Handbook is not contained in the record on appeal misrepresents the record in this case. Portions of the Crop Insurance

and that Bush was not excused from reading the insurance policy and related documents.

The insurance policy provides, in pertinent part:

[i]t is your responsibility to accurately report all information that is used to determine your approved yield. . . . (3) If you do not have written verifiable records to support the information on your production report, you will receive an assigned yield in accordance with section 3(f)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have such records.

With regard to record retention, the policy provides as follows:

(a) We, and any employee of USDA authorized to investigate or review any matter relating to crop insurance, have the right to examine the insured crop and all records related to the insured crop and any mediation, arbitration or litigation involving the insured crop as often as reasonably required during the record retention period.

(b) You must retain, and provide upon our request, or the request of any employee of USDA authorized to investigate or review any matter relating to crop insurance: . . .

---

Handbook were introduced by Bush *without* objection during the hearing on the motion for summary judgment.

(2) All records used to establish the amount of production you certified on your production reports used to compute your approved yield for three years after the calendar date for the end of the insurance period for the crop year for which you initially certified such records, unless such records have already been provided to us. . . .

The policy defines "production report" as

[a] written record showing your annual production and used by us to determine your yield for insurance purposes in accordance with section 3. The report contains yield information for previous years, including planted acreage and production. This report must be supported by written verifiable records from a warehouseman or buyer of the insured crop, by measurement of farm-stored production, or by other records of production approved by us on an individual basis in accordance with FCIC approved procedures.

It defines "verifiable records" as having "the same meaning as the term defined in 7 CFR part 400, subpart G."

Georgia law provides that, as a general rule,

an insurance agent who undertakes to procure a policy of insurance for his principal but negligently fails to do so may be held liable to the principal for any resulting loss. However, where the agent does procure the requested policy and the insured fails to read it to determine which particular risks are covered and which are excluded, the agent is thereby

13

insulated from liability, even though he may have undertaken to obtain full coverage.

(Citations and punctuation omitted.) *Atlanta Women's Club v. Washburne*, 207 Ga. App. 3, 4 (427 SE2d 18) (1992). See also *Traina Enterprises v. Cord & Wilburn, Inc. Ins. Agency*, 289 Ga. App. 833, 837 (658 SE2d 460) (2008) (insured has duty to read and examine insurance policy to determine whether the coverage requested was procured). However, as we explained in *Washburne*,

> [a]n exception to this rule applies where the agent, acting in a fiduciary relationship with the insured, holds himself out as an expert in the field of insurance and performs expert services on behalf of the insured under circumstances in which the insured must rely upon the expertise of the agent to identify and procure the correct amount or type of insurance.

(Citations and punctuation omitted.) 207 Ga. App. at 4. See also *Belu*, 332 Ga. App. at 686-687 (1); *Vickery*, 274 Ga. App. at 431 (2).

The expert exception will apply if there is evidence that the agent undertook to perform an additional service and the insured relied on the agent to perform that service. See *Fregeau v. Hall*, 196 Ga. App. 493, 494 (396 SE2d 241) (1990), citing *Wright Body Works v. Columbus Interstate Ins. Agency*, 233 Ga. 268, 271 (210 SE2d 801) (1974). If the agent held herself out as expert, the insured is relieved of the

14

responsibility to minutely examine the policy, but not relieved of all responsibility; rather, "[t]he duty to read remains where an examination of the policy would have made it readily apparent that the coverage contracted for was not issued." (Citations and punctuation omitted.) *Washburne*, 207 Ga. App. at 5. Accord *Heard v. Sexton*, 243 Ga. App. 462, 463 (1) (532 SE2d 156) (2000). A policy provision is "readily apparent" upon examination if it is "plain and unambiguous." (Footnote omitted.) *MacIntyre & Edwards, Inc. v. Rich*, 267 Ga. App. 78, 81 (1) (599 SE2d 15) (2004).

Viewing the evidence in the light most favorable to Bush, there is evidence that Meeks undertook to perform an additional service for Bush by calculating the APH and that Bush relied on Meeks' expertise in this regard because he knew nothing about crop insurance. Although this is not a case where Meeks had discretion to determine the type of insurance procured, Bush depended on Meeks to ensure that his crop was adequately insured against loss, which necessarily required Meeks to properly calculate the APH based on proper documentation as governed by the rules set out in the Crop Insurance Handbook.

It is for a jury to decide whether Meeks' alleged failure to ask Bush for records to support the APH and her alleged failure to use written verifiable records to calculate the APH constituted negligence and/or negligent misrepresentation. Where

15

the evidence raises questions of fact as to whether the agent or agency went beyond mere procurement and offered expert advice upon which the insured relied, summary judgment is improper. *Belu*, 332 Ga. App. at 688 (1). See *Wright Body Works*, 233 Ga. at 269 (by undertaking to review annually the business audits of the plaintiff company and to determine if insurance policies were sufficient, agent did more than issue policy); *Vickery*, 274 Ga. App. at 427-428, 431 (affirming denial of summary judgment where evidence showed that insurance agency improperly advised insured that his personal production history could be used as underlying documentation for insurance application); *McCoury v. Allstate Ins. Co.*, 254 Ga. App. 27, 28-29 (2) (561 SE2d 169) (2002) (reversing grant of summary judgment to insurance agent on claim of negligence because there was evidence that insureds relied on agent's expertise in determining policy coverage on their home); *Jim Anderson & Co. v. ParTraining Corp.*, 216 Ga. App. 344, 345 (1) (454 SE2d 210) (1995) (affirming denial of summary judgment to insurance agent where evidence showed an issue of material fact regarding whether insured relied on agent to provide expertise in seeking to procure business interruption coverage). As we held in *McCoury*, an insured's duty to read the policy does not bar a claim of negligence grounded on the theory that the

16

insurance agent "was negligent in arriving at [an adequate coverage] figure." 254 Ga. App. at 29 (2). Bush has asserted an analogous theory in this case.

Defendants contend that the documentation requirement was readily apparent on the face of the application documents as well as the policy and that Bush's admitted failure to read these documents precludes recovery. Because we hold that an issue of fact exists as to whether the expert exception applies, the next inquiry is whether "it would have been readily apparent to a layman reading the insurance policy, based upon the plain and ordinary meaning of clear and unambiguous language, that the risk causing the loss was not covered." *Washburne*, 207 Ga. App. at 5. Contrary to defendants' contention, a jury could find that Bush, a layperson, could not be expected to read the policy here and determine what constitutes a written verifiable record, for one thing. The policy at issue refers to supporting "written verifiable records" and relies upon reference to a federal regulation to define that term. It would not have been readily apparent to Bush, on the face of the policy, that the weight tickets or other information he provided to Meeks were not adequate to meet the definition of "written verifiable record."

Even if Bush had the read the policy from beginning to end, he would not have known that the calculation was not properly done in accordance with federal

regulations. Calculating the APH was up to the expert agent and governed by the rules set out in the Crop Insurance Handbook. Meeks even had a copy of the Crop Insurance Handbook to use in calculating the proper APH and testified that she consulted it several times per year. For these reasons alone, the trial court erred in granting summary judgment to defendants. See id.

3. In *Vickery*, we discussed the second exception to the general rule requiring an insured to read and examine an insurance policy: "[W]here the evidence reflects a special relationship of trust or other unusual circumstances which would have prevented or excused plaintiff [from exercising] ordinary diligence to ensure that no ambiguity existed between the requested insurance and that which was issued." (Citation and punctuation omitted.) 274 Ga. App. at 431 (2). Implicit in our reliance on *Washburne*, supra, and our finding in Division 4 (a), infra, lies the conclusion that a jury question exists as to whether the parties had "a special relationship of trust."

4. Bush lastly contends that the trial court erred in granting summary judgment on his claims for fraud and punitive damages. We agree in part.

(a) *Fraud*. "In order to prove fraud, the plaintiff must establish five elements: (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5)

18

damage to plaintiff." (Citation and punctuation omitted.) *Engelman v. Kessler*, 340 Ga. App. 239, 246 (2) (797 SE2d 160) (2017). Bush's claim for fraud is based on the ground that defendants knew the APH on his application was not in compliance with the rules and regulations of the federal crop insurance program, but nonetheless reported the figure to help assure that Bush would be able repay the loans made to him by AgSouth. Defendants contend that Bush's fraud claim fails because he did not read his policy; if Bush had read his policy, he would have known that he did not have the necessary documents to support the APH he certified as true and correct. Bush contends that he was justified in relying on Meeks' representations because she had a fiduciary or confidential relationship with him. "Under Georgia law, a [fiduciary or] confidential relationship imposes a greater duty on the parties to reveal what should be revealed and a lessened duty to discover independently what could have been discovered through the exercise of ordinary care." *Yarbrough v. Kirkland*, 249 Ga. App. 523, 526 (2) (548 SE2d 670) (2001). "Because a confidential relationship may be found whenever one party is justified in reposing confidence in another, the existence of a confidential or fiduciary relationship is generally a factual matter for the jury to resolve." (Citation and footnote omitted.) *Bienert v. Dickerson*, 276 Ga. App. 621, 625 (2) (a) (624 SE2d 245) (2005).

As we set out in Division 2, supra, the evidence construed in Bush's favor presents a jury issue regarding whether Meeks, "acting in a fiduciary relationship with [Bush], [held herself] out as an expert in the field of [crop] insurance. . . ." See Division 2, supra, citing *Washburne*, 207 Ga. App. at 4. Similarly, a jury question exists on the issue of whether a fiduciary relationship existed between the parties such that Bush justifiably relied on defendants' representations. See, e.g., *Powell v. James, Hereford & McClelland*, 189 Ga. App. 747 (1) (377 SE2d 683) (1989) ("Where an insurance agent acts as agent for the insured, there is a fiduciary relationship between them."). In this regard, Georgia law provides that "[f]raud may be actual or constructive[,]" the latter consisting "of any act of ommission or commission, contrary to legal or equitable duty, trust, or *confidence justly reposed*, which is contrary to good conscience and operates to the injury of another." (Emphasis supplied.) OCGA § 23-2-51. See also OCGA § 23-2-53 ("The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."). "Misrepresentation of a material fact, made willfully to deceive or recklessly without knowledge and acted upon by the opposite party or made innocently and mistakenly and acted upon by the opposite party, constitutes legal fraud." OCGA § 23-2-52.

20

As this Court has often stated, while "[f]raud cannot be presumed[,] slight circumstances may be sufficient to carry conviction of its existence." (Citation and punctuation omitted.) *Fed. Ins. Co. v. Westside Supply Co.*, 264 Ga. App. 240, 242 (1) (590 SE2d 224) (2003). Moreover, "proof of fraud is rarely susceptible of direct proof[;]. . . recourse to circumstantial evidence *usually is required*." (Citation and punctuation omitted; emphasis in original). Id. For this reason, "scienter [i.e., intent or knowledge of wrongdoing,] in actions based on fraud is an issue of fact for jury determination." Id. See also *Stephen A. Wheat Trust v. Sparks*, 325 Ga. App. 673, 677 (2) (754 SE2d 640) (2014) ("questions of fraud . . . are, except in plain and indisputable cases, questions for the jury") (citations and punctuation omitted).

Based on our review of the record, we find that whether Meeks had knowledge that the APH on Bush's application was not in compliance with the rules and regulations of the federal crop insurance program, but nonetheless reported the figure to help assure that Bush would be able repay the loans made to him by AgSouth, are issues of fact left to a jury. Accordingly, the trial court erred in granting defendants' motion for summary judgment on Bush's fraud claim. See *Crawford v. Johnson*, 227 Ga. App. 548, 553 (2) (c) (489 SE2d 552) (1997) (under theory of respondeat superior, employer not entitled to summary judgment in action alleging fraud and

21

negligence: "The rule of 'respondeat superior,' or that the master shall be civilly liable for the tortious acts of his servant, is of universal application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize, or even know of the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable, if the act be done in the course of his servant's employment.") (citation and punctuation omitted). See also *Stewart v. Boykin*, 165 Ga. App. 868, 872 (303 SE2d 50) (1983) (reversing grant of summary judgment to defendant insurance agent and his agency on claims of negligence and fraud because a genuine issue of material fact existed as to whether an agency relationship existed between defendants and plaintiff); *Johnson v. Pennington Ins. Agency*, 148 Ga. App. 147 (1) (251 SE2d 116) (1978) (reversing grant of summary judgment to defendant where issues of fact remained as to defendant's status as plaintiff's agent in acquiring insurance).

(b) *Punitive Damages*. With regard to Bush's claim for punitive damages, the record shows that AgSouth is a member of the Farm Credit System. As a member of the Farm Credit System – a federal instrumentality – AgSouth is immune to a punitive damages award. See *Farm Credit of Northwest Fla., ACA v. Easom Peanut Co.*, 312

22

Ga. App. 374, 384-385 (3) (e) (718 SE2d 590) (2011) . Accordingly, the trial court correctly granted summary judgment to AgSouth on Bush's punitive damages claim. The trial court, however, erred in granting summary judgment to Meeks on this claim. "Wilful misconduct or fraud justifies a punitive damages award." *Bienert*, 276 Ga. App. at 625 (624 SE2d 245) (2005), citing OCGA § 51-12-5.1 (b). Given our holding in Division 4 (a), Meeks' actions may justify an award of punitive damages.

*Judgment affirmed in part and reversed in part. Miller, P. J., concurs. Andrews, J., concurs in judgment only.\**

\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).